IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CECIL THOMAS AND JOHN DEAN on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>TXX SERVICES, INC and PATRICIA DOUGAN HUNT<br>Defendants. | 13-cv-2789 (SJF)(WDW) |

### Declaration of John Dean

1. I, John Dean, under penalty of perjury, affirm the following:

### BACKGROUND:

2. TXX Services, Inc. is in the business of delivering merchandise to pharmacies and other retail locations. Other than delivering merchandise, TXX has no other business.

3. I was employed by TXX from September 2008 to January 2012, for nearly four years to deliver their customers' merchandise to banks, retail locations, hospitals, and drug stores and pharmacies such as Capital One Bank, Rite Aid, Shirley Pharmacy, Leggetts Pharmacy, and others.

4. TXX classified me as an independent contractor, however, I was not in business for myself and I depended entirely on TXX for all of my income.

5. TXX did not require that I have prior experience in order to work for them.

6. I do not have a commercial driver's license, and TXX did not require that I have one.

7. TXX required that I purchase my own van in order to deliver their customers' products, which I sometimes drive for personal use.

8. TXX required I use a van of a certain size for deliveries. I purchased a cargo van, which weighs less than 10,000 pounds.

9. I worked under the supervision, direction and control of the dispatchers, Tiki Sangrin and Jose Portello, and the managers James Becker and Tom Guiliani of TXX.

10. During my time at TXX I was given uniforms and tee shirts that either said "TXX" or "Transportation". I was required to wear these uniforms while working.

11. TXX gave me a TXX identification card and required me to bring it to work each day.

## THE WORKDAY

12. TXX did not allow me to turn down deliveries or shifts. If I or other drivers turned down deliveries or shifts, we were threatened with having our route taken away.

13. If I choose to refuse extra work that TXX directs me to perform, a dispatcher can take away my route, tell me to go home, or put me on standby (suspend me from working without pay), thus economically injuring me.

14. I was not allowed to share stops or routes with other drivers without the approval of TXX.

15. In order to take time off, I must request unpaid days off, and I must secure the approval of a dispatcher or floor manager, or else I am threatened with having my route taken away.

2

16. TXX currently requires me to report to a TXX warehouse and sign in at 5:30 a.m. to pick up TXX's daily merchandise for delivery at the beginning of my workday.

17. When a driver arrived after 5:45 a.m., TXX would lock him out of the warehouse even though the driver had ample time to load his truck and start his route in a timely manner.

18. Under these circumstances, the driver could have stops taken from his or her route, could be told to go home without work, or could be made to wait without pay as a "standby".

19. When a driver arrives late, TXX also directs him to sign a sheet stating that he arrived late. TXX keeps this information on file and uses it to make deductions from drivers' pay.

20. Once you arrive at the TXX warehouse in the morning, TXX does not permit you to leave, and I was required to wait on the premises until the merchandise was ready for delivery. On the average I would wait two hours without pay until TXX tells me that I am ready to start delivering.

21. TXX determined the manner and means of how I was to perform my work. Both the schedule and route which I worked were assigned to me by TXX and were not under my control. My schedule was determined by TXX. I was required to make stops and deliver merchandise at the times scheduled by TXX to make the deliveries.

22. TXX gave me a manifest each and every morning. This manifest detailed the stops I have to make and what cargo I have to deliver. I had no say in the content of this manifest or the sequence of deliveries TXX required me to make.

23. When I did not make a delivery by the specified time, or made deliveries in an order that varied from what TXX required, a dispatcher or floor manager called me to reprimand me.

24. When I made a late delivery, TXX deducted all the pay I earned from that stop.

25. The route I worked was substantially similar every day. My route was the same each day, Monday through Friday. The route I drove on Saturdays was different from the one I worked during the week, but I worked the same route each Saturday.

26. TXX required that I bring receipts to each customer and have that receipt signed. TXX also required that I bring that receipt back to their office and give it to my manager. I was required to return manifests and receipts on a daily basis.

27. After the completion of my morning route, I then performed an afternoon route. For the afternoon route, TXX required that I arrive at a different warehouse at 2:30 pm. TXX also required that I arrive at the warehouse with a full tank of gas, to ensure that I finish deliveries within their expected time frame.

28. At the end of my workday TXX requires me to verify to TXX management that I have completed my deliveries. TXX requires me to telephone a dispatcher at the conclusion of my deliveries and to return empty containers ("totes") to the TXX Warehouse. I did not get paid for my time returning empty totes, returning merchandise from customers, or submitting C2 and other forms to TXX's management.

29. I regularly worked, on the average, twelve hours a day Monday through Friday, and seven hours on Saturday and Sunday for an average weekly total of sixty-seven hours, but I was never paid overtime. Monday through Friday I typically finished work between five and six

4

pm, and on Saturday I worked from seven am to two pm. TXX did not allow me to take breaks during my workday.

### TXX's CUSTOMERS

30. I had no business relationships with any of TXX's customers or with their customers' employees. I worked directly for TXX and I had no working relationship with any other company.

31. I was not allowed to contract directly with TXX's customers or to work as a delivery driver for TXX's customers without going through TXX. TXX prohibited me from having contracts with any of TXX's customers for whom I made deliveries.

32. When merchandise was not delivered on time, TXX's customers complained directly to TXX.

### METHOD OF PAY

33. TXX paid me per stop, regardless of how big or small the cargo is for that stop. TXX sets the rate of pay per stop.

34. While TXX claims I have a right to negotiate the rate I receive per stop, that "right" is illusory as I have never had the opportunity to do so. When I asked for more pay, I was told that they will find someone else to do the work.

35. I did not have the ability to negotiate prices with TXX's customers or to change prices. TXX determined the delivery charges without any input from me.

36. TXX informs me of my pay rate verbally, not through writing.

5

37. I am often paid less than I was promised for stops I make.

38. I forced to sign a new contract at least once each year. When TXX hands me a new contract I am told that if I do not sign it I will have my route taken away, which is the same as being fired. These contracts my change the structure of my pay, but since I cannot afford to lose my job which is my only source of income, I feel like there is no longer a point in even reading what TXX requires me to sign.

39. TXX managers would bring me new contracts to sign while I was preparing cargo at the warehouse. It was as if TXX waited for a time when everyone was busy to force five page contracts on us. We were not allowed to begin our deliveries if we did not sign those contracts first. We had the option of either signing the contract without reading it or losing our routes. Because I was economically dependent on TXX, I always signed the contracts without reading them.

## DEDUCTIONS FROM PAY

40. Each week TXX took deductions from my check for insurance, administrative fees, worker's compensation, and equipment fees.

41. TXX also fines drivers, for example Joe Morris, for not following company policies such as arriving on time for work.

42. TXX also makes drivers, for example Cecil Thomas, pay for lost or stolen merchandise.

## MANDATORY TRAININGS

43. I was required to attend mandatory meetings and training sessions. For example, dispatchers at TXX called a meeting of all drivers and gave us a training session on how to use

6

scanners to sort out and load TXX's merchandise.

44. In 2010, drivers were required to attend a meeting in the evening to discuss work operations, as well as a new contract given to us. The meeting was held by Donna Levantini.

### OTHER REQUIREMENTS

45. TXX required me to create a business name in order to continue working for them. TXX directed me to Donna Levantini at an organization called the Contractor Associates of the North East (CANE) for this purpose. I have been told that CANE is owned and operated by family relatives of Defendant Patricia Dougan Hunt.

46. The paperwork necessary to receive a business license and business name were not filled out or submitted by me, but rather by Sheila Hunt (sister of Defendant Patricia Dougan Hunt).

47. I have not advertised my "business name", nor have I bought an ad in the Yellow Pages.

48. TXX requires that I purchase accident insurance while on the job. TXX will not provide work if I do not have this insurance. If I do not purchase it on my own, TXX makes deductions from my pay for it.

49. TXX performed a credit check, driver's license check and background check on me before I began working with them.

50. In order to work as a driver for TXX, I was required to sign a contract that said I was an independent contractor.

7

51. TXX had the power to terminate my employment at will. This rule applies to all drivers.

52. TXX terminated my employment in January of 2012 because I took a day off of work.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 06/16, 2013

New York, NY

John Dean

8

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2013, I caused to be electronically filed a true and correct copy of the foregoing DECLARATION OF JOHN DEAN utilizing the Court's CM/ECF system, which will automatically send notice of such filing to Plaintiffs' following attorneys of record listed below:

>Douglas Weiner, Esq.h
>JOSEPH & KIRSCHENBAUM LLP
>233 Broadway, 5th Floor
>New York, NY 10279

Dated: November 5, 2013
New York, NY

*Ira M. Saxe/s/*
Ira M. Saxe