IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CECIL THOMAS AND JOHN DEAN on behalf of
themselves and all others similarly situated,

Plaintiffs,

-against-

TXX SERVICES, INC and PATRICIA DOUGAN
HUNT

Defendants.

13-cv-2789 (SJF)(WDW)

### Declaration of Derek Lewis

1. I, Derek Lewis, under penalty of perjury, affirm the following:

### BACKGROUND:

2. TXX Services, Inc. is in the business of delivering merchandise to hospitals, pharmacies, banks, and other retail locations. TXX has no business other than delivering merchandise.

3. I was employed by TXX from September 2011 to September 2013, for two years to deliver their customers' merchandise to banks, retail locations, hospitals, and drug stores and pharmacies.

4. TXX classified me as an independent contractor, however, I was not in business for myself and I depended entirely on TXX for all of my income.

5. TXX did not require that I have prior experience in order to work for them.

6. I do not have a commercial driver's license, and TXX did not require that I have one.

1

7. TXX required that I purchase my own van in order to deliver their customers' products, which I sometimes drove for personal use.

8. I drove a Ford cargo van during my time at TXX. In 2011, when I started working for TXX, most drivers used minivans, but TXX began to tell drivers that if they did not purchase large cargo vans, TXX would terminate them.

9. I worked under the supervision, direction and control of the dispatchers, Tiki Sangrin and Jose Portello, and the managers James Becker and Tom Guiliani of TXX.

10. TXX gave me a TXX identification card and required me to bring it to work each day.

## THE WORKDAY

11. TXX did not allow me to turn down deliveries or shifts. If I or other drivers turned down deliveries or shifts, we were threatened with termination.

12. Dispatcher Jose told me that if I refused work that TXX directed me to perform, I would be terminated, suspended, or placed on "standby" (compelling me to wait on TXX's premises without pay in case I was needed), thus economically injuring me.

13. In order to take time off, TXX required me to request unpaid days off, and I needed to secure the approval of a dispatcher or floor manager, or else I was threatened with termination.

14. During a snowstorm in the winter of 2012, I got into an accident on my way to work and my van was stuck in a ditch on the side of the road. I called TXX to inform them that I could not make it to work and dispatcher Jose told me if I did not make it to the TXX warehouse on time, I would be terminated. My wife had to pick me up at the site of the accident and rush

me to the TXX office because I could not afford to lose my only source of income.

15. In the summer of 2013 I experienced a tragic death in the family. I requested a day off from work at TXX so I could attend the funeral, but TXX told me that if I went to the funeral instead of coming to work, I would be terminated.

16. During September of 2013 my van would not function properly and I was not able to use it for work. Dispatcher Jose told me that if I did not come into work, I would be terminated. In order to keep my only source of income, I had to rent a U-haul truck.

17. In September of 2013, I was terminated for not coming in to work. Due to the fact that I missed a court date for a traffic violation I received while working, I was incarcerated for a day and was unable to get to work. When I got to the TXX warehouse the next day I was told that I was terminated precisely because I did not make it to work the day before.

18. TXX prohibited me from sharing stops or routes with other drivers without the explicit approval of TXX.

19. TXX required me to report to a TXX warehouse and sign in at 5:30 a.m. to pick up TXX's daily merchandise for delivery at the beginning of my workday.

20. When a driver arrived after 5:45 a.m., TXX would lock him out of the warehouse even though the driver had ample time to load his truck and start his route in a time manner.

21. Under these circumstances, the driver could have stops taken from his or her route, could be told to go home without work, or could be made to wait without pay as a "standby".

22. Once a driver arrived at the TXX warehouse in the morning, TXX did not permit you to leave, and I was required to wait on the premises until all the merchandise was ready for delivery. On the average I would wait three hours without pay until TXX told me that the

merchandise was ready to be delivered.

23. TXX determined the manner and means of how I performed my work. Both the schedule and route which I worked were assigned to me by TXX and were not under my control. My schedule was determined by TXX. I was required to make stops specified by TXX and deliver merchandise at the times scheduled by TXX.

24. TXX gave me a manifest each and every morning. This manifest detailed the stops I was required to make and what cargo I was required to deliver. I had no say in the content of this manifest or the sequence of deliveries TXX required me to make.

25. When I did not make a delivery by the specified time, or made deliveries in an order that varied from what TXX required, a dispatcher or floor manager called me to reprimand me.

26. The route I worked was substantially similar every day. I worked one fixed route each day, Monday through Friday.

27. TXX required that I bring receipts to each customer and have that receipt signed. TXX also required that I bring that receipt back to their office and give it to my manager. I was required to return manifests and receipts on a daily basis. If these manifests and receipts were not returned, I was not paid for my work.

28. At the end of my workday TXX required me to verify to TXX management that I had completed my deliveries. TXX required me to telephone a dispatcher at the conclusion of my deliveries and to return empty containers ("totes") to the TXX Warehouse. I did not get paid for my time returning empty totes, returning merchandise from customers, or submitting C2 and other forms to TXX's management.

29. I regularly worked, on the average, nine hours a day Monday through Friday for an average weekly total of forty-five hours, but I was never paid overtime. There were also times when TXX called me in the afternoon and on Saturdays to perform more work. When they called I was required to do as they directed.

30. During the workday, TXX was able to monitor me through GPS tracking. When I deviated from my route, I would receive a call from TXX reprimanded me and instructing me to get back to delivery.

31. When I tried to pull over to take a break from my workday, I would receive a call from TXX telling me to get back on my route.

### TXX's CUSTOMERS

32. I had no business relationships with any of TXX's customers or with their customers' employees. I worked directly for TXX and I had no working relationship with any other company.

33. I was not allowed to contract directly with TXX's customers or to work as a delivery driver for TXX's customers without the approval of TXX. TXX prohibited me from having contracts with any of TXX's customers for whom I made deliveries.

34. When merchandise was not delivered on time, TXX's customers complained directly to TXX and in turn, TXX reprimanded me.

### METHOD OF PAY

35. TXX paid me per stop, regardless of how big or small the cargo was for that stop. TXX sets the rate of pay per stop.

36. While TXX claims I had a right to negotiate the rate TXX paid me per stop that "right" is illusory as I never had the power to do so. When I asked TXX for more pay, I was told that TXX will find someone else to do the work.

37. I did not have the ability to negotiate prices with TXX's customers or to change prices. TXX determined the delivery charges without any input from me.

38. TXX informed me of my pay rate verbally, not through writing.

39. I was often paid less than TXX promised for stops I made.

## DEDUCTIONS FROM PAY

40. Each week TXX took deductions from my check for insurance, administrative fees, worker's compensation, and equipment fees.

41. TXX also fines drivers, for example Joe Morris, for not following company policies such as arriving on time for work.

42. TXX also makes drivers, for example Harpal Sawhney, pay for lost or stolen merchandise.

## MANDATORY TRAININGS

43. I was required to attend mandatory meetings and training sessions. For example, dispatchers at TXX called a meeting of all drivers and gave us a training session on how to use scanners to sort out and load TXX's merchandise.

44. In 2010, drivers were required to attend a meeting in the evening to discuss work operations. The meeting was held at a TXX warehouse and conducted by Donna Levantini.

6

## OTHER REQUIREMENTS

45. TXX required me to create a business name in order to continue working for them. TXX directed me to Donna Levantini at an organization called the Contractor Associates of the North East (CANE) for this purpose. I have been told that CANE is owned and operated by family relatives of Defendant Patricia Dougan Hunt.

46. I do not operate a business and I have not advertised my "business name", nor have I bought an ad in the Yellow Pages.

47. TXX required that I purchase accident insurance while on the job. TXX would not provide work if I did not have this insurance. If I did not purchase it on my own, TXX made deductions from my pay for it.

48. TXX performed a credit check, driver's license check and background check on me before I began working with them.

7

49. In order to work as a driver for TXX, I was required to sign a contract that said I was an independent contractor.

50. TXX had the power to terminate my employment at will. This rule applies to all drivers.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10-17, 2013

New York, NY

*Derek Lewis*

**Derek Lewis**

8

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2013, I caused to be electronically filed a true and correct copy of the foregoing DECLARATION OF DEREK LEWIS utilizing the Court's CM/ECF system, which will automatically send notice of such filing to Plaintiffs' following attorneys of record listed below:

> Douglas Weiner, Esq.
> JOSEPH & KIRSCHENBAUM LLP
> 233 Broadway, 5th Floor
> New York, NY 10279

Dated: November 5, 2013
      New York, NY

*Ira M. Saxe/s/*
Ira M. Saxe