**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
**CECIL THOMAS AND JOHN DEAN on**
**behalf of themselves and all others similarly**          **13 CV 2789 (SIL)**
**situated,**

        **Plaintiffs,**

   **v.**

**TXX SERVICES, INC and PATRICIA**
**DOUGAN HUNT,**

        **Defendants.**
----------------------------------------------------------x


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


JOSEPH & KIRSCHENBAUM LLP
D. Maimon Kirschenbaum
Denise A. Schulman
32 Broadway, Suite 601
New York, NY 10004
212-688-5640

*Attorneys for Plaintiffs and Opt-In Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. i

I.  PRELIMINARY STATEMENT ........................................................................... 1

II.  STATEMENT OF FACTS ..................................................................................... 2

III.  ARGUMENT ........................................................................................................... 3

A.  The Court Should Disregard All Improper Assertions In Defendants' 56.1 Statement ...... 4

B.  A Reasonable Jury Could Find That The Discovery Plaintiffs Were Employees Under The FLSA .................................................................................................. 6

  i.  The Discovery Plaintiffs were economically dependent on TXX .................................. 7

  ii.  There are numerous disputed facts relating to the *Brock* factors that preclude summary judgment ......................................................................................... 11

    a.  Control ............................................................................................ 12

    b.  Opportunity for profit or loss and investment in the business .................................... 18

    c.  Degree of skill and independent initiative ................................................. 22

    d.  Permanence or duration of the working relationship .................................. 24

    e.  The Discovery Plaintiffs' work is an integral part of TXX's business ..................... 25

    f.  Totality of the circumstances ................................................................ 27

C.  A Reasonable Jury Could Find That The Discovery Plaintiffs Were Employees Under The NYLL .................................................................................................. 27

D.  A Reasonable Jury Could Find That Patricia Hunt Was The Discovery Plaintiffs' Employer ....................................................................................... 31

IV.  CONCLUSION .................................................................................................... 35

# TABLE OF AUTHORITIES

**Federal Cases**

*287 Franklin Ave. Residents' Ass'n v. Meisels*, No. 11 CV 976,
2015 U.S. Dist. LEXIS 124466 (E.D.N.Y. Sept. 17, 2015)..............................5

*Acosta v. Off Duty Police Servs.*, 915 F.3d 1050 (6th Cir. 2019) ................................*passim*

*Acosta v. Senvoy, LLC*, No. 16 CV 2293,
2018 U.S. Dist. LEXIS 133295 (D. Ore. July 31, 2018) .................................21,23,26

*Agerbrink v. Model Serv. LLC*, 787 Fed. Appx. 22 (2d Cir. 2019) ............................*passim*

*Agerbrink v. Model Serv. LLC*, No. 14 CV 7841,
2017 U.S. Dist. LEXIS 33249 (S.D.N.Y. Mar. 8, 2017) ..................................30

*Anderson v. DIRECTTV Inc.*, No. CV 14-02307,
2017 U.S. Dist. LEXIS 215955 (D. Ariz. July 26, 2017) ................................20

*Artola v. MRC Express, Inc.*, No. 14 CV 23219,
2015 U.S. Dist. LEXIS 130183 (S.D. Fla. Sept. 25, 2015) .............................18

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436 (5th Cir. 1998)...........................21,24

*Banco Cent. De Paraguay v. Paraguay Humanitarian Found., Inc.*, No. 01 Civ. 9649,
2005 U.S. Dist. LEXIS 293 (S.D.N.Y. Jan. 7, 2005).......................................5

*Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008)....................7,14

*Boatner v. MSD Grps., Inc.*, No. 17 CV 801,
2019 U.S. Dist. LEXIS 74004 (S.D. Ohio May 2, 2019) ................................21,26

*Bobbitt v. Broadband Interactive, Inc.*, No. 11 CV 2855,
2013 U.S. Dist. LEXIS 150854 (M.D. Fla. Oct. 21, 2013) .............................8,9,16

*Bridgeforth v. City of New York*, No. 16 CV 273,
2018 U.S. Dist. LEXIS 108315 (S.D.N.Y. June 28, 2018).............................6

*Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042 (5th Cir. 1987) ................................7

*Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) .......................................*passim*

*Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590 (E.D.N.Y. 2012)...................22

*Campos v. Zoupounidis*, No. 09 CV 1138,
    2011 U.S. Dist. LEXIS 78905 (D. Conn. July 20, 2011)................................. 22

*Collinge v. IntelliQuick Delivery, Inc.*, No. 12 CV 824,
    2015 U.S. Dist. LEXIS 35860 (D. Ariz. Mar. 23, 2015) ................................. *passim*

*Dalton v. Omnicare, Inc.*, 138 F. Supp. 3d 709 (N.D.W.V. 2015) .............................. 8

*Dean v. Univ at Buffalo Sch. of Med. & Biomedical Scis.*,
    804 F.3d 178 (2d Cir. 2015)............................................................................. 3

*DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456 (D. Conn. 2009)... 22

*Dixon v. Zabka*, No. 11 CV 982,
    2014 U.S. Dist. LEXIS 159692 (D. Conn. Nov. 13, 2014) ............................ 26

*Dole v. Snell*, 875 F.2d 802 (10th Cir. 1989)............................................................... 21

*Donovan v. Dialamerica Marketing, Inc.*, 757 F.2d 1376 (3d Cir. 1985) ................... 26

*Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004)..................................................... 3

*Fernandez v. Kinray, Inc.*, No. 13 CV 4938,
    2018 U.S. Dist. LEXIS 52653 (E.D.N.Y. Mar. 28, 2018) .............................. 12,18,22

*Flanigan v. Vulcan Power Group, LLC*, 642 Fed. Appx. 46 (2d Cir. 2016) ............... 32

*Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468 (N.D. Cal. 2017) ................... 14,2

*Franze v. Bimbo Foods Bakeries Distrib., LLC*, No. 17 CV 3556,
    2019 U.S. Dist. LEXIS 110711 (S.D.N.Y. July 2, 2019) ............................... 22

*Gayle v. Harry's Nurses Registry, Inc.*, No. 07 CV 4672,
    2009 U.S. Dist. LEXIS 17768 (S.D.N.Y. Mar. 9, 2009) ............................... 26

*Gianullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) ........................................ 5

*Gleeson v. County of Nassau*, No. 15 CV 6487,
    2019 U.S. Dist. LEXIS 170373 (E.D.N.Y. Sept. 30, 2019)............................ 6

*Greene v. City of New York*, No. 08 CV 00243,
    2017 U.S. Dist. LEXIS 37243 (E.D.N.Y. Mar. 15, 2017) .............................. 5

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013) ................... 28,29

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999) .................................... 32,33,34,35

*Ho v. Sims Enters.*, No. 11 Civ. 2855,
    2014 U.S. Dist. LEXIS 66408 (S.D.N.Y. May 14, 2014)................................ 34

*Holtz v. Rockefeller & Co.*, 258 F.3d 62 (2d Cir. 2001) ............................................... 4,5

*Hopkins v. Cornerstone Am.*, 545 F.3d 338 (5th Cir. 2008) ........................................ 21

*Inclan v. N.Y. Hosp. Group, Inc.*, 95 F. Supp. 3d 490 (S.D.N.Y. 2015)...................... 32,33

*Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) .................................................... 31,32

*Jasco Tools, Inc. v. Dana Corp.*, 574 F.3d 129 (2d Cir. 2009).................................... 33

*Kaytor v. Elec. Boat Corp.*, 609 F.3d 537 (2d Cir. 2010)............................................. 4

*Keller v. Miri Microsystems LLC*, 781 F.3d 799 (6th Cir. 2015) ................................ 18,21,24

*Kinney v. Artist & Brand Agency LLC*, No. 13 CV 8864,
    2015 U.S. Dist. LEXIS 160465 (S.D.N.Y. Nov. 24, 2015) ............................ 20,26

*Landaeta v. N.Y. & Presbyterian Hosp., Inc.*, No. 12 Civ. 4462,
    2014 U.S. Dist. LEXIS 27677 (S.D.N.Y. Mar. 4, 2014) ................................ 14,24,29,30

*Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217 (D. Kan. 2008) ................. 18,23,26

*Lovo v. Express Courier Int'l, Inc.*, NO. 16 CV 853,
    2019 U.S. Dist. LEXIS 16824 (N.D. Tex. Jan. 30, 2019) ............................... 16,22,23

*Maldonado v. Callahan's Express Delivery, Inc.*, No. 13 CV 292,
    2018 U.S. Dist. LEXIS 6202 (M.D. Fla. Jan. 12, 2018).................................. 9,12

*McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364 (S.D.N.Y. 2014)................... 35

*Meidenbauer v. Zenith Acquisition Corp.*, No. 13 CV 00799,
    2018 U.S. Dist. LEXIS 82738 (W.D.N.Y. May 15, 2018) .............................. 34

*Mikhaylov v. Y & B Transp. Co.*, No. 15 CV 7109,
    2019 U.S. Dist. LEXIS 59203 (E.D.N.Y. Mar. 31, 2019) .............................. 22

*Morales v. M. Alfonso Painting Corp.*, No. 11 Civ. 1263,
    2013 U.S. Dist. LEXIS 134219 (S.D.N.Y. Sept. 19, 2013)............................. 33

*Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010).................................................... 12,13,23,25

*Ramirez v. Riverbay Corp.*, 35 F. Supp. 3d 513 (S.D.N.Y. 2014)............................... 35

*Rodriguez v. Schneider*, No. 95 Civ. 4083,
    1999 U.S. Dist. LEXIS 9741 (S.D.N.Y. June 29, 1999)..................................6

*Rogoz v. City of Hartford*, 796 F.3d 236 (2d Cir. 2015)................................4

*Salazar v. Brown*, No. G87-961,
    1996 U.S. Dist. LEXIS 18113 (W.D. Mich. Apr. 10, 1996) ...........................10

*Saleacsi v. Quicksilver Delivery Sys.*, No. 06 CV 1297,
    2007 U.S. Dist. LEXIS 88747 (M.D. Fla. Nov. 28, 2007) ..............................23

*Saleem v. Corp. Transp. Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017)...........................*passim*

*Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013)................................*passim*

*Solis v. A+ Nursetemps, Inc.*, No. 07 CV 182,
    2013 U.S. Dist. LEXIS 49595 (M.D. Fla. Apr. 5, 2013) .................................9

*Solis v. Kansas City Transp. Group*, No. 10 CV 0887,
    2012 U.S. Dist. LEXIS 122047 (D. Mo. Aug. 28, 2012) ...............................14,19,22

*Solis v. Velocity Express, Inc.*, No. CV 09-864,
    2010 U.S. Dist. LEXIS 84973 (D. Ore. Aug. 12, 2010)..................................13,16,18,29

*Spicer v. Pier Sixty LLC*, 269 F.R.D. 321 (S.D.N.Y. 2010) .........................................33

*Thomas v. TXX Servs.*, 663 Fed. Appx. 86 (2d Cir. 2016)............................................*passim*

*Thomas v. TXX Servs.*, No. 13 CV 2789,
    2015 U.S. Dist. LEXIS 135027 (E.D.N.Y. Mat 22, 2015) ..............................22,25

*Tubo v. Orange Reg'l Med. Ctr.*, No. 13 CV 1495,
    2015 U.S. Dist. LEXIS 139254 (S.D.N.Y. Oct. 13, 2015) ..............................5

*United States v. Rosenwasser*, 323 U.S. 360 (1945)....................................................6

*Villalpando v. Exel Direct Inc.*, No. 12 CV 04137,
    2015 U.S. Dist. LEXIS 118065 (N.D. Cal. Sept. 3, 2015) ..............................14

*Wang v. LW Rest., Inc.*, 81 F. Supp. 3d (E.D.N.Y. 2015).............................................35

*Young v. Act Fast Delivery of W. Va., Inc.*, No. 16 CV 9788,
    2018 U.S. Dist. LEXIS 682 (S.D.W.V. Jan. 3, 2018)......................................23,27

**State Cases**

*Anikushina v. Moodie*, 58 A.D.3d 501 (N.Y. App. Div. 1st Dep't 2009).................... 29,31

*Bermudez v. Ruiz*, 185 A.D.2d 212 (N.Y. App. Div. 1st Dep't 1992)......................... 31

*Bonito v. Avalon Partners, Inc.*, 106 A.D.3d 625 (N.Y. App. Div. 1st Dep't 2013).... 31

*Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193 (2003) .................................................. 28

*Hernandez v. Chefs Diet Delivery, LLC*,
    81 A.D.3d 596 (N.Y. App. Div. 2d Dep't 2011) ............................................... 30

*In re CDK Delivery Serv., Inc.*, 151 A.D.2d 932 (N.Y. App. Div. 3d Dep't 1989) ..... 31

*In re Fecca*, 171 A.D.3d 1423 (N.Y. App. Div. 3d Dep't 2019) ................................... 31

*In re Kelly*, 28 A.D.3d 1044 (N.Y. App. Div. 3d Dep't 2006) ..................................... 31

*In re Magdylan*, 172 A.D.3d 1832 (N.Y. App. Div. 3d Dep't 2019) ........................... 30,31

*Meyer v. Martin*, 16 A.D.3d 632 (N.Y. App. Div. 2d Dep't 2005) .............................. 30

*Shanley v. Louise Blouin Media, Inc.*, No. 151232/2014,
    2018 N.Y. Misc. LEXIS 5629 (Sup. Ct. N.Y. County Nov. 26, 2018) ........... 30

*Williams v. One Call Motor Freight Inc.*, No. 115466/2005,
    2010 N.Y. Misc. LEXIS 4093 (Sup. Ct. N.Y. County Aug. 25, 2010) ............ 29,30

**Statutes, Rules, and Regulations**

21 U.S.C. § 821 ............................................................................................................. 17

28 C.F.R. § 0.100 .......................................................................................................... 17

29 U.S.C. § 203 .............................................................................................................. 6

Fed. R. Civ. P. 56 ........................................................................................................... 3

Local Civil Rule 56.1 ..................................................................................................... 2,4,5

## I.     PRELIMINARY STATEMENT

In 2016, the Second Circuit vacated an earlier grant of summary judgment in this case, finding that Plaintiffs, delivery drivers for Defendant TXX Services Inc. ("TXX"), presented sufficient evidence for a jury to find that they were employees rather than independent contractors. *Thomas v. TXX Servs., Inc.* ("*TXX I*"), 663 Fed. Appx. 86 (2d Cir. 2016).  The factual disputes present at that time and many others remain now that the parties have exchanged hundreds of thousands of pages of documents and taken dozens of depositions.  These disputes go to the heart of whether Plaintiffs "depended upon [TXX's] business for the opportunity to render service or [were] in business for [themselves]" which, the Second Circuit recently emphasized, is the core concern under the Fair Labor Standards Act ("FLSA").  *Agerbrink v. Model Serv. LLC*, 787 Fed. Appx. 22, 26 (2019).  These disputes also bear directly on the degree of control exercised by TXX, which is the main focus under the New York Labor Law ("NYLL").  *Id*. at 26 n.2.

Among other things, Plaintiffs have set forth evidence that Defendants controlled their work assignments and pay rates, subjected them to significant supervision and discipline, exercised control over their schedules, and had sole control of the customer relationship.  Plaintiffs' work was also integral to TXX's business, and they worked for TXX on a long-term and largely exclusive basis.  Under these facts and *TXX I*, it is clear that a reasonable jury could find that Plaintiffs were employees under the FLSA and NYLL, and summary judgment is inappropriate.

The record also shows that Defendant Patricia Hunt, TXX's CEO, made the decision to classify TXX's drivers as independent contractors, which is the action challenged in this case.  P. Hunt has remained actively involved in TXX's operations, including by taking the leading role in defending the classification of drivers as independent contractors before the New York Department of Labor and by exercising control over drivers' work assignments and pay rates.  This is more

1

than sufficient evidence for a jury to find that P. Hunt is an employer under the FLSA and NYLL. For the reasons set forth below, Defendants motion should be denied in full.

## II.      STATEMENT OF FACTS

Plaintiffs incorporate by reference their Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("CMF"), and highlight the following facts for the Court's convenience.[1]

TXX is in the delivery business.  Its customers contract with TXX to deliver their merchandise or other freight.  These deliveries generate TXX's revenue.  (CMF ¶¶ 470-77.)  At TXX's inception, it classified its delivery drivers as employees.  However, Defendant Patricia Hunt decided to switch to an independent contractor model for delivery drivers, which TXX maintains to this day.  (*Id.* at ¶ 727.)

The Discovery Plaintiffs[2] have worked for TXX as delivery drivers for between two and a half and 24 years.  (*Id.* at ¶¶ 430-51.)  TXX did not require the Discovery Plaintiffs to have any prior experience or specialized skill in order to work for the company.  (*Id.* at ¶¶ 453-56.)  All of the Discovery Plaintiffs worked exclusively or primarily for TXX.  (*Id.* at ¶ 458.)  TXX also set the Discovery Plaintiffs' pay rates and changed those pay rates at will.  (*Id.* at ¶¶ 554-88.)

TXX dispatchers or managers assigned work to Discovery Plaintiffs.  (*Id.* at ¶¶ 523-33.) Those assignments fall into two categories – Routes and Specials.  Routes are regular, recurring groups of stops.  TXX determines which stops to include in a Route.  Once a Discovery Plaintiff was assigned a Route, it was his or hers indefinitely.  He or she had to make all deliveries on his or her Route, and TXX added and removed stops from Routes without consulting with Discovery

---

[1] Plaintiffs cite herein their CMF, Defendants' 56.1 statement ("SUF"), Defendants' memorandum of law in support of summary judgment ("Defs.' Mem."), and exhibits and declarations submitted by the parties, which are referred to by exhibit number and declarant's last name.

[2] The parties stipulated, and this Court so-ordered, that Defendants would move for summary judgment with respect to the Discovery Plaintiffs, *i.e.*, those Named and Opt-In Plaintiffs who participated in discovery.  (Dkt. No. 259.) Accordingly, this brief focuses on the Discovery Plaintiffs rather than the Opt-In Plaintiffs at large.

Plaintiffs.  (*Id*. at ¶¶ 499-501, 506-509, 534, 540-41.)  Specials are all non-Route deliveries, such as one-time deliveries or overflow work.  (*Id*. at ¶¶ 518-19.)  TXX required Discovery Plaintiffs to take certain assignments and penalized them if they attempted to reject those assignments.  (*Id*. at ¶¶ 149, 540, 549-53.)

TXX controlled Discovery Plaintiffs' schedules through Route assignments and by setting the time when Discovery Plaintiffs had to get to the TXX or customer warehouse to pick up freight. (*Id*. at ¶¶ 631-35.)  TXX also supervised the Discovery Plaintiffs, both in the TXX warehouses and while Discovery Plaintiffs were on the road, through meetings, phone calls, and other forms of monitoring.  (*Id*. at ¶¶ 654-83, 701-11.)  TXX disciplined drivers, including Discovery Plaintiffs, for actual or perceived infractions by threatening to and actually taking away work, reducing pay, and levying fines.  (*Id*. at ¶¶ 684-705.)  It was TXX's sole decision how to classify Discovery Plaintiffs for tax purposes.  (*Id*. at ¶¶ 396, 727.)

## III.    ARGUMENT

"Summary judgment is appropriate only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 186 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). In deciding a summary judgment motion, a district court must only determine whether issues of fact exist rather than resolving such factual issues.  *TXX I*, 663 Fed. Appx. at 89.  "The burden is on the moving party to establish the absence of any material factual issues."  *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  To defeat summary judgment, therefore, the non-moving party need only point to sufficient evidence in the record from which "a reasonable jury could find in the non-movant's favor."  *Dean*, 804 F.3d at 186 (internal quotation marks omitted).  In this analysis, the court "must *draw all reasonable inferences in the favor of the nonmoving party*, even

though contrary inferences might reasonably be drawn." *Kaytor v. Elec. Boat Corp.*, 609 F. 3d 537, 545 (2d Cir. 2010) (internal citations and quotation marks omitted).  Further, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." *Id.* (internal citations and quotation marks omitted).  In sum, "[s]ummary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit, for the court in considering such a motion *must disregard all evidence favorable to the moving party that the jury is not required to believe*." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (internal citations and quotation marks omitted).

## A. The Court Should Disregard All Improper Assertions In Defendants' 56.1 Statement

Defendants' SUF contains many (1) factual assertions that are not properly supported by citation to relevant and admissible evidence and (2) statements that are arguments or conclusions rather than factual assertions.  This Court should disregard all such statements, which are identified in Plaintiffs' CMF.

Local Civil Rule 56.1(a) requires a party moving for summary judgment to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The party opposing summary judgment must respond in correspondingly numbered paragraph.  Local Civil Rule 56.1(c).  Each such statement "must be followed by citation to evidence which would be admissible[.]"  Local Civil Rule 56.1(d).

The purpose of 56.1 statements is to focus summary judgment proceedings on the key factual issues in dispute. As such, the Rule has the effect of "freeing the Court from hunting through a voluminous record without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  Indeed, "a court is not required to consider what the parties fail to

4

point out." [3]  *Id.* at 73.  Accordingly, a court must disregard unsupported assertions of fact "even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 141 (2d Cir. 2003) (internal quotation marks omitted); *see also*, *e.g.*, *Greene v. City of New York*, No. 08 CV 00243, 2017 U.S. Dist. LEXIS 37243, at *4 n.3 (E.D.N.Y. Mar. 15, 2017) (disregarding assertions not supported by citation to admissible evidence); *Tubo v. Orange Reg'l Med. Ctr.*, No. 13 CV 1495, 2015 U.S. Dist. LEXIS 139254, at *3 (S.D.N.Y. Oct. 13, 2015) (same).  Defendants have failed to properly support many assertions in their 56.1 statement by citation to relevant and admissible evidence. For example, Defendants repeatedly make assertions regarding the activities of "Transportation Service Providers," previously defined by Defendants as the Opt-In Plaintiffs and the entities through which they worked for TXX (SUF ¶ 3 ("All Opt-In Plaintiffs as described above and their Driver-Corporations are collectively referred to herein as 'Transportation Service Providers.'")), yet cite only or largely non-party declarations that discuss the activities of non-parties, who are, by definition, not Transportation Service Providers.  (*E.g.*, *id*. at ¶¶ 7-9, 16, 65.)  The cited materials do not concern the Opt-In Plaintiffs and, therefore, do not support assertions regarding the Opt-In Plaintiffs' actions.  These assertions, and all others in Defendants' 56.1 statement that are not supported by citation to relevant and admissible evidence, should be disregarded.

In addition, "Rule 56.1 statements are not argument.  They should contain factual assertions, with citation to the record.  They should not contain conclusions, and they should be

---

[3] While a court may, in its discretion, independently review the record when a party fails to support its assertions in a 56.1 statement, it need not do so.  *287 Franklin Ave. Residents' Ass'n v. Meisels*, No. 11 CV 976, 2015 U.S. Dist. LEXIS 124466, at *6 n.5 (E.D.N.Y. Sept. 17, 2015) (internal quotation marks omitted).  "The Court's role is not to wander aimlessly through the record in search of evidence that substantiates the allegations in the Rule 56.1 statement." *Banco Cent. De Paraguay v. Paraguay Humanitarian Found., Inc.*, No. 01 Civ. 9649, 2005 U.S. Dist. LEXIS 293, at *24 (S.D.N.Y. Jan. 7, 2005).  Proper citations in 56.1 statements are particularly important on this motion, which has a voluminous record including 394 exhibits from Defendants alone.  The Court should not undertake the burdensome task of combing the entire record simply because Defendants have failed to properly support many assertions in their 56.1 statement.

neither the source nor result of 'cut-and-paste' efforts with the memorandum of law." *Rodriguez v. Schneider*, No. 95 Civ. 4083, 1999 U.S. Dist. LEXIS 9741, at *4 n.3 (S.D.N.Y. June 29, 1999). However, Defendants repeatedly set forth arguments and conclusions in their 56.1 statement.  By way of example, their 56.1 statement is replete with assertions that the Opt-In Plaintiffs "exercise discretion" by doing or to do certain things.  (*E.g.*, SUF ¶¶ 7, 15-16, 20, 27, 51-53, 59, 65, 76, 78.) This is an improper to attempt to argue that the fact that Discovery Plaintiffs engaged in the identified actions reflects a lack of control by TXX.  Whether and to what extent TXX controlled the Discovery Plaintiffs is central to determining whether they were employees or independent contractors, as discussed below.  Any arguments about what does or does not amount to control belong in the parties' briefs, not their 56.1 statements.  As with unsupported factual assertions, courts should disregard all arguments and conclusions in a 56.1 statement.  *E.g.*, *Gleeson v. County of Nassau*, No. 15 CV 6487, 2019 U.S. Dist. LEXIS 170373, at *4 n.2 (E.D.N.Y. Sept. 30, 2019); *Bridgeforth v. City of New York*, No. 16 CV 273, 2018 U.S. Dist. LEXIS 108315, at *10; (S.D.N.Y. June 28, 2018); *Tubo*, 2015 U.S. Dist. LEXIS 139254, at *3.

### B. A Reasonable Jury Could Find That The Discovery Plaintiffs Were Employees Under The FLSA

Under the FLSA, an "employee" is "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "'[e]mploy' includes to suffer or permit to work."  29 U.S.C. § 203(g).  "A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame."  *United States v. Rosenwasser*, 323 U.S. 360, 363 (1945).  To differentiate between employees, who are entitled to the protections of the FLSA, and independent contractors, who are not, the courts apply an "economic reality" test.  As the Second Circuit noted earlier in this litigation, this test is a "fact-intensive" totality of the circumstances analysis.  *TXX I*, 663 Fed. Appx. at 88.  Under the economic reality test, "any relevant evidence may be considered[.]"  *Brock*

6

*v. Superior Care, Inc*, 840 F.2d 1054, 1059 (2d Cir. 1988). The test examines the entirety of the working relationship to determine "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service [(employees)] or are in business for themselves [(independent contractors)]." *Id.*

The Second Circuit has identified five nonexclusive factors (the "*Brock* factors") that are "helpful in identifying relevant facts" in this analysis but are not to be mechanically applied. *Saleem v. Corp. Transp. Group, Ltd.*, 854 F.3d 131, 140 & n.2. The *Brock* factors are:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Superior Care*, 840 F.2d at 1058-59. "[T]hese factors are merely aids to analysis, and are helpful only insofar as they elucidate the economic reality of the arrangement at issue." *Saleem*, 854 F.3d at 139-140 (internal quotation marks and citations omitted). "The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts . . . is a question of law." *Superior Care*, 840 F.2d at 1059. With respect to each factor, "'it is not what Plaintiffs *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.'" *Saleem*, 854 F.3d at 142 (quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987)) (brackets omitted). Given the fact-intensive nature of the economic reality test, questions of employee status cannot typically be resolved on summary judgment. *Cf. Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 143-44 (2d Cir. 2008).

### i. The Discovery Plaintiffs were economically dependent on TXX

As was the case in *TXX I*, 663 Fed. Appx. at 89-90, the parties continue to dispute how the Discovery Plaintiffs obtained their work assignments and how their pay rates were established.

While these issues are relevant to several of the *Brock* factors, they bear more broadly on the ultimate question of economic dependence that the *Brock* factors seek to illuminate. Specifically, these two issues are fundamental to "whether, as a matter of economic reality [the Discovery Plaintiffs] depended upon [TXX's] business to render service or were in business for [themselves]. These are material facts. They are in dispute." *Agerbrink*, 787 Fed. Appx. at 26. Thus, these disputes alone preclude summary judgment. *Id*.

The Discovery Plaintiffs have described a system in which TXX dictated their work assignments and set their pay. (CMF ¶¶ 523-33, 536-79.) Dispatchers and other supervisors assigned the Discovery Plaintiffs predetermined Routes as well as Specials. (*Id*. at ¶¶ 523-24, 527-29, 531.) *Bobbitt v. Broadband Interactive, Inc.*, No. 11 CV 2855, 2013 U.S. Dist. LEXIS 150854, at *9-10 (M.D. Fla. Oct. 21, 2013); *Collinge v. IntelliQuick Delivery, Inc.*, No. 12 CV 824, 2015 U.S. Dist. LEXIS 35860, at *15 (D. Ariz. Mar. 23, 2015). In addition to the Discovery Plaintiffs' testimony, several current and former TXX dispatchers have confirmed that TXX assigned work to drivers. (CMF ¶¶ 531-32, 592-93, 595.) On numerous occasions, TXX required Discovery Plaintiffs to take certain assignments they did not want and punished Discovery Plaintiffs when they attempted to or did turn down assignments.[4] (*Id*. at ¶¶ 536-41, 549-53.) *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1313 (11th Cir. 2013) ("[P]laintiffs testified that they could not reject a route or a work order within their route without threat of termination or being refused work in the following days. Thus, while a technician might consider a specific route or work order unprofitable, . . . plaintiffs had no power to decline the assignment."); *Dalton v. Omnicare, Inc.*, 138 F. Supp. 3d 709, 721 (N.D.W.V. 2015). Dispatchers frequently threatened to take away the

---

[4] It is immaterial that on some occasions, some Discovery Plaintiffs may have turned down work offers. When it mattered to TXX, TXX could and did require Discovery Plaintiffs to accept assignments or suffer punishment. *Cf. Superior Care*, 840 F.2d at 1060 ("An employer does not need to look over its workers' shoulders every day in order to exercise control.").

Discovery Plaintiffs' and other drivers' Routes in response to the drivers' complaints or simply because drivers displeased the dispatchers.  (CMF ¶¶ 551, 558, 561-62, 578, 633, 640, 646, 692-95.)  This sent the clear message to the Discovery Plaintiffs that they had to comply with the dispatchers' whims in order to keep their jobs.  This subordinate posture is not that of one who is in business for him or herself.

TXX typically unilaterally dictated the Discovery Plaintiffs' pay rates.  Dispatchers or supervisors either told Discovery Plaintiffs their pay rates up front on a take it or leave it basis or gave Discovery Plaintiffs assignments without telling them the pay rate, leaving the Discovery Plaintiffs to learn their rates once they received their pay for the work they performed.  (*Id*. at ¶¶ 532-33, 554.)  *Bobbit*, 2013 U.S. Dist. LEXIS 150854, at *18.  TXX changed Route composition and pay rates without any notice to Discovery Plaintiffs.  (CMF ¶¶ 536-37, 540, 544, 556, 564, 571-72, 575-76.)  *Scantland*, 721 F.3d at 1317 ("Technicians could not negotiate or otherwise determine the rates they were paid for jobs.  In fact, the billing codes they submitted were subject to unilateral change by Knight."); *Bobbitt*, 2013 U.S. Dist. LEXIS 150854, at *18.  Sometimes TXX paid Discovery Plaintiffs different rates for deliveries for different customers on the same Route.  The Discovery Plaintiffs had no say in this, and the reason for the different rates was unknown to the Discovery Plaintiffs.  (CMF ¶¶ 543, 556.)  At times, TXX refused to pay Discovery Plaintiffs at the promised rate or at all.  (*Id*. at ¶¶ 564-79.)  TXX's dominance in setting pay rates is typical of the lopsided employer-employee relationship, not an independent contractor relationship.  *Maldonado v. Callahan's Exp. Delivery, Inc.*, No. 13 CV 292, 2018 U.S. Dist. LEXIS 6202, at *14 (M.D. Fla. Jan. 12, 2018); *Solis v. A+ Nursetemps, Inc.*, No. 07 CV 182, 2013 U.S. Dist. LEXIS 49595, at *18 (M.D. Fla. Apr. 5, 2013).  Discovery Plaintiffs accepted these unequal terms precisely because they were economically dependent on TXX.  (CMF ¶ 457.)

9

Contrary to Defendants' contention, TXX has never maintained a *bona fide* bidding system.  Defendants' own witnesses could not agree on what "bidding" means, using that term to describe, *inter alia*, dispatchers simply offering drivers Routes or stops at pay rates set by TXX.  (*Id*. at ¶¶ 589-600.)  *See Salazar v. Brown*, No. G87-961, 1996 U.S. Dist. LEXIS 18113, at *14, 24 (W.D. Mich. Apr. 10, 1996) (finding that under a similar so-called "bidding" system, "[p]rices were set [by defendants] on a take-it-or-leave-it basis").  In contrast, the method by which TXX obtains work from its customers reflects what is commonly understood to be bidding.  Namely, a customer issues a request for proposal that does not contain any stated expectation with respect to pricing.  TXX then submits a proposal, including pricing, to a customer.  The customer then accepts or rejects TXX's proposal.  (CMF ¶¶ 483-84.)

TXX did not have even the appearance of similar process for Routes until a short period in 2013, and then again starting in 2016.  (*Id*. at ¶¶ 603-606, 611.)  TXX has *never* placed Specials up for bidding; dispatchers have always assigned Specials to drivers.  (*Id*. at ¶¶ 182, 618-20.)  Even after 2013, TXX dispatchers and managers continued to assign Routes to Discovery Plaintiffs rather than distributing those Routes based on bidding.  (*Id*. at ¶¶ 607-609.)  Moreover, most Discovery Plaintiffs never placed a bid on work at TXX, and only two – Paul and Oliveira – got a Route on which they placed a bid.  (*Id*. at ¶¶ 612-14.)  In both cases, that happened in 2016 or later.  Prior to 2016, *no Discovery Plaintiff* obtained any work through bidding.  (*Id*. at ¶¶ 613-15.)  With the exception of Paul and Oliveira, all of the Discovery Plaintiffs who were working for TXX in 2016 already had Routes that TXX had assigned them and they kept them without having to submit bids.  (*Id*. at ¶ 614.)  Paul and Oliveira submitted bids in 2016 only because TXX chose to restructure their Routes and then required them to submit bids in order to continue working.  (*Id*.)  Even after Paul and Oliveira placed bids, TXX continued to maintain total control over pay rates,

10

as it failed to pay Paul and Oliveira their bidded rates, without any discussion with Paul and Oliveira.  (*Id*. at ¶¶ 615-17.)  In short, with rare exceptions starting only in 2016, bidding was not how Discovery Plaintiffs got work from TXX.  This reality, and not any paper trail Defendants have sought to create regarding bidding, it what matters for the economic dependence analysis, *Saleem*, 854 F.3d at 142, and it weighs in favor of finding the Discovery Plaintiffs to be employees.

TXX rarely responded to Discovery Plaintiffs' requests for higher pay by actually raising pay rates.  (CMF ¶ 557.)  On the contrary, dispatchers frequently responded to such requests by saying that if Discovery Plaintiffs did not like the pay they could leave, *i.e.*, not work.  (*Id*. at ¶ 558.)  The Second Circuit has found that evidence of this type of "take it or leave it" approach to pay rates creates a dispute as to who determined a putative employee's rate of payment, such that summary judgment is inappropriate.  *Agerbrink*, 787 Fed. Appx. at 25.  At times, TXX even penalized Discovery Plaintiffs who asked for higher pay by reducing their pay or taking away a Route for a few days.  (CMF ¶¶ 561, 575.)

As set forth above, Plaintiffs have submitted more than enough evidence from which a jury could conclude that TXX controlled the Discovery Plaintiffs' work assignments and pay rates, and as a result, the Discovery Plaintiffs were economically dependent on TXX.  Accordingly, Defendants' motion should be denied.  *Agerbrink*, 787 Fed. Appx. at 26 ("independence to determine [one's] schedule and income are key inquiries to determining" whether a worker is economically dependent).

### ii.  There are numerous disputed facts relating to the *Brock* factors that preclude summary judgment

There are additional factual disputes relating to the *Brock* factors that preclude summary judgment.  Many of these disputes were also present in *TXX I*, such as disputes as to the degree of control TXX exercised over Discovery Plaintiffs, whether TXX set rules for Discovery Plaintiffs,

whether Discovery Plaintiffs were free to reject assignments, and whether Discovery Plaintiffs could control their schedules. *TXX I*, 663 Fed. Appx. at 89-90. Thus, under *TXX I*, Defendants' motion must be denied.

### a. Control

"Control is only significant when it shows an individual exerts such control over a meaningful part of the business that she stands as a separate economic entity." *Scantland*, 721 F.3d at 1313 (internal quotation marks omitted). Disputed facts regarding the control factor are, without more, sufficient to warrant denying summary judgment. *Fernandez v. Kinray, Inc.*, No. 13 CV 4938, 2018 U.S. Dist. LEXIS 52653, at *18-19 (E.D.N.Y. Mar. 28, 2018). Here, there are numerous facts in the record from which a jury could conclude that the control factor weighs in favor of employee status.

As described *supra* Section III.B.i., the parties dispute whether TXX or the Discovery Plaintiffs controlled which work assignments the Discovery Plaintiffs got and what TXX paid them. Whether considered in the context of the overall question of economic dependence or the specific *Brock* control factor, these are highly significant and material disputes. *E.g.*, *Scantland*, 721 F.3d at 1315 (noting that defendant "controlled what jobs plaintiffs did [and] how much they were paid"); *Narayan v. EGL, Inc.*, 616 F.3d 895, 902 (9th Cir. 2010) ("The plaintiff Drivers also submitted evidence that, although their contracts purportedly gave them the right to pick and choose assignments, in practice, EGL presented them with batches of deliveries that they generally had to accept as an all-or-nothing proposition."); *Maldonado*, 2018 U.S. Dist. LEXIS 6202, at *14 ("[I]n an independent contractor relationship, the independent contractor normally has at least an equal say in the rate to be charged for particular work by bidding on the job or by posting or advertising standard rates for the work to be performed. Here, it is not clear whether any driver .

12

. . had any say in the amount he was paid.") (internal alteration and quotation marks omitted); *Solis v. Velocity Express, Inc.*, No. CV 09-864, 2010 U.S. Dist. LEXIS 84973, at *17-18 ("[A] trier of fact could find that route selection was a meaningful way in which [defendant] exercised control over its drivers] in part because drivers got route assignments after contracting with defendant), *11-12, 19-20 (D. Ore. Aug. 12, 2010).

Crucially, TXX controlled the composition of Routes.  (CMF ¶¶ 501, 505-507, 509.)  By grouping stops into Routes, Defendants exerted significant control over Discovery Plaintiffs.  The particular stops included in a Route affected Discovery Plaintiffs' pay, as TXX paid different rates for stops for different customers, for reasons unknown to Discovery Plaintiffs.  (*Id*. at ¶ 556.)  TXX also removed stops from Routes without notice to or input from Discovery Plaintiffs, which reduced their pay.  (*Id*. at ¶¶ 536-37, 544-45, 565.)  Moreover, TXX required Discovery Plaintiffs to take all stops on their Routes, including stops that TXX added from time to time without notice to or consulting with Discovery Plaintiffs.  (*Id*. at ¶¶ 540-41.)  *Narayan*, 616 F.3d at 902.  If a Discovery Plaintiff tried to reject a stop on his or her Route, a dispatcher said he or she would lose the entire Route.  (CMF ¶ 540.)  Because Plaintiffs had to take all stops on their Routes, the number and location of the stops effectively determined the length of Discovery Plaintiffs' workdays and the amount of gas used and wear and tear on their vehicles.  *Scantland*, 721 F.3d at 1313 & n.5; *Velocity Express*, 2010 U.S. Dist. LEXIS 84973, at *17.

TXX also solely controlled the customer relationship, including what customers paid TXX. (CMF ¶¶ 470-71, 481-84.)  Discovery Plaintiffs could not have made deliveries for those customers other than through TXX.  As Defendants have emphasized, TXX maintains secure facilities which are necessary for the transfer of its customers' freight and which the Discovery Plaintiffs have never had.  (SUF ¶ 6; CMF ¶ 16; Defs.' Mem. at 2.)  It is also clear from the fact

13

that TXX's customers contract with TXX to arrange for delivery of their freight rather than directly retaining hundreds of drivers to do so that TXX's customers do not want to deal directly with drivers.  (CMF ¶ 470.)  To be sure, customers complained to TXX about drivers' performance issues, including late deliveries, failing to scan freight, attitude problems, and failing to collect empty totes, and expected that TXX could and would take action to address those problems.  (*Id.* at ¶¶ 479, 658, 681, 700-705.)  *Landaeta v. N.Y. & Presbyterian Hosp., Inc.*, No. 12 Civ. 4462, 2014 U.S. Dist. LEXIS 27677, at *19-20 (S.D.N.Y. Mar. 4, 2014) (fielding calls about putative employee's performance is employer-like control).  What customers paid TXX also set a limit on what TXX was willing to pay Discovery Plaintiffs.  (Dean Decl. ¶ 13.)  *E.g.*, *Barfield*, 537 F.3d at 144-45.  While TXX has alleged that it sometimes paid drivers more than what its customers pay, TXX has not identified a single instance – much less a regular occurrence – where it paid a Discovery Plaintiff more than what a customer paid for a delivery.  TXX's exclusive control over the customer relationship is indicative of an employer-employee relationship.  *Solis v. Kan. City Transp. Group*, No. CV 09-864, 2012 U.S. Dist. LEXIS 122047, at *26-27 (D. Mo. Aug. 28, 2012) ("Drivers could not negotiate individually with KCATA or KCMSD and could only participate in these programs due to their association with Defendant. Without Defendant, SAF and KCMSD income would not continue. On this basis, I find that drivers driving under the SAF and KCMSD program were economically dependent on Defendant."); *see also Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 472 (N.D. Cal. 2017); *Villalpando v. Exel Direct Inc.*, No. 12 CV 04137, 2015 U.S. Dist. LEXIS 118065, at *35 (N.D. Cal. Sept. 3, 2015).

TXX also supervised and disciplined the Discovery Plaintiffs.  "An employer does not need to look over his workers' shoulders every day in order to exercise control."  *Superior Care, Inc.*, 840 F.2d at 1059.  "[T]he level of supervision necessary in a given case is in part a function of the

14

skills required to complete the work at issue." *Acosta v. Off Duty Police Servs.* ("*ODPS*"), 915 F.3d 1050, 1061 (6th Cir. 2019). Thus, periodic supervision is sufficient to establish control over an individual engaged in low skilled, routine work. *Id.* Here, Defendants engaged in meaningful supervision of the Discovery Plaintiffs, even though the Discovery Plaintiffs' work was low skilled and routine, as discussed *infra* Section III.B.ii.c. Dispatchers and other TXX supervisors instructed Discovery Plaintiffs on how to load their vehicles, complete paperwork, use electronic scanners, and get to delivery locations. (CMF ¶¶ 654-59.) Dispatchers and other TXX supervisors have checked Discovery Plaintiffs out of the TXX warehouse, accompanied Discovery Plaintiffs on new Routes to ensure that the Discovery Plaintiffs completed their assignments properly, and followed drivers, including Discovery Plaintiffs, to check on their job performance. (*Id.* at ¶¶ 655-58, 662, 666-69.) TXX has threatened and punished drivers for attempting to or actually rejecting work assignments, asking for higher pay, leaving vehicle doors unlocked, making delivery errors, questioning dispatchers, and not moving quickly enough. (*Id.* at ¶¶ 540, 551, 558, 561, 575-76, 578, 663-64, 684-705.) TXX required Discovery Plaintiffs to contact a dispatcher while on the road if a delivery location was closed or they had vehicle problems, and to confirm delivery times. (*Id.* at ¶¶ 670-72.) Dispatchers contacted Discovery Plaintiffs on the road to give them additional assignments, check on delivery times, and address delivery mistakes. (*Id.* at ¶ 673.) *See TXX I*, 663 Fed. Appx. at 90.

Dispatchers also held meetings with drivers on an as needed basis to discuss policies and procedures and to point out drivers' mistakes and make examples of the drivers who made mistakes. (CMF ¶¶ 664, 706-11.) TXX has disciplined drivers by firing them, threatening to take away Routes, and actually taking away Routes. (*Id.* at ¶¶ 540, 551-52, 561, 633-34, 640, 646, 663, 692-96.) TXX dispatchers and supervisors regularly yelled at drivers in the TXX warehouse,

15

creating an intimidating environment where drivers felt that they must comply with the dispatchers' wishes in order to keep their jobs.  (*Id*. at ¶¶ 664, 684-93.)  This level of supervision and discipline is highly probative of employee status.  *E.g.*, *ODPS*, 915 F.3d at 1060 (company withheld other work opportunities when workers refused assignments); *Lovo v. Express Courier Int'l, Inc.*, No. 16 CV 853, 2019 U.S. Dist. LEXIS 16824 at *11-13, 16-17 (N.D. Tex. Jan. 30, 2019) (company threatened to and did take work away as punishment and provided instruction as to how to use scanner and make deliveries); *Bobbitt*, 2013 U.S. Dist. LEXIS 150854, at *14-15 (workers called defendant if they had problems while working, and defendant called them to give additional assignments); *see also Superior Care*, 840 F.2d at 1060.

TXX also exercised control over the Discovery Plaintiffs' schedules.  TXX set the times when Discovery Plaintiffs had to arrive to work and punished drivers, including Discovery Plaintiffs, who were late.  (CMF ¶¶ 631-35.)  *ODPS*, 915 F.3d at 1060 (fact that defendant told workers when to go to work weighed in favor of employer status).  TXX required Discovery Plaintiffs to return empty totes, returned merchandise, and paperwork to TXX by a set time and punished Discovery Plaintiffs who did not do so.  (CMF ¶¶ 636-37.)  The Discovery Plaintiffs' Routes – which were compiled and assigned by TXX – themselves imposed scheduling constraints on the Discovery Plaintiffs as discussed *supra*.  Dispatchers prohibited drivers from making unscheduled stops and threatened punishment for violations.  (*Id*. at ¶¶ 639-40.)  Even if dispatchers had not made that prohibition, TXX designed the Routes in such a way that Discovery Plaintiffs were unable to take meaningful breaks and make their deliveries on time.  (*Id*. at ¶ 638.) *See Lovo*, 2019 U.S. Dist. LEXIS 16824, at *11; *Velocity Express*, 2010 U.S. Dist. LEXIS 84973, at *17.

16

Defendants' assertion that the Discovery Plaintiffs merely complied with "Shipper Notices and PODs mandated by DEA and other Government Requirements to assure appropriate custody and control of the Freight" is false.  (Defs.' Mem. at 17.)  No Shipper Notices were provided to Discovery Plaintiffs until October 19, 2010; prior to that time, there were no Shipper Notices for Discovery Plaintiffs to comply with.  (CMF ¶ 19.)  Moreover, a jury could find that the Shipper Notices were actually created by TXX, not its customers, because the Notices are nearly identical; include errors relating to the customers' names and freight, which the customers themselves would be unlikely to make; and contain identical grammatical errors.  (*Id*.)  Defendants have not identified which DEA regulations, if any, apply to Discovery Plaintiffs' work, and the Discovery Plaintiffs have no knowledge of such regulations.  (*Id*. at ¶ 9.)  In any event, the DEA regulates controlled substances only, 21 U.S.C. § 821, 28 C.F.R. § 0.100, and most of the freight Discovery Plaintiffs deliver is *not* controlled substances.  (*E.g.*, CMF ¶ 18.)  Thus, DEA regulations have no impact on most of the Discovery Plaintiffs' work for TXX.  Moreover, although Defendants contend that TXX does not enforce customer rules, indicating that they believe TXX is not obligated to do so, TXX in fact enforces rules in the so-called Shipper Notices.  (*Id*. at ¶ 223.)

In any event, TXX does far more than simply enforce customer rules.  TXX required Discovery Plaintiffs to form business entities in order to work for TXX, and it set and enforced the Discovery Plaintiffs' arrival times, required Discovery Plaintiffs to get permission to take time off, checked Discovery Plaintiffs out of the TXX warehouse in the morning, and required Discovery Plaintiffs to work certain days or times.  (*Id*. at ¶¶ 462-67, 631-35, 641-42, 647, 666-68.)  At one point, TXX tracked Discovery Plaintiffs via GPS.  (*Id*. at ¶¶ 274, 674.)  Until around 2012 or 2013, TXX directed Discovery Plaintiffs to wear uniforms identifying them as TXX agents, and at times TXX has directed Discovery Plaintiffs to use certain types of vehicles.  (*Id*. at ¶¶ 712-14; Baratta

Ex. 1; Morris Ex. 4.)  None of this control was even arguably mandated by TXX's customers, and it is all indicative of an employer-employee relationship.  *TXX I*, 663 Fed. Appx. at 89-90; *Scantland*, 721 F.3d at 1314-15; *Narayan*, 616 F.3d at 902; *Artola v. MRC Express, Inc.*, No. 14 CV 23219, 2015 U.S. Dist. LEXIS 130183, at *21-22 (S.D. Fla. Sept. 25, 2015).

For the foregoing reasons, a jury could find that the control factor weighs in favor of finding Discovery Plaintiffs to be employees, and Defendants are not entitled to summary judgment.  *TXX I*, 663 Fed. Appx. at 89-90; *Fernandez*, 2018 U.S. Dist. LEXIS 52653, at *18 ("Too many facts related to the issue of control are disputed. Absent the resolution of these facts, the court cannot properly assess the 'totality of the circumstances' and any decision on a motion for summary judgment would be error.").

### b.  Opportunity for profit or loss and investment in the business

"The second [*Brock*] factor considers the alleged employee's opportunity for profit or loss depending upon his managerial skill."  *Scantland*, 721 F.3d at 1316; *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 812 (6th Cir. 2015).   TXX's control over the Discovery Plaintiffs' job assignments and pay rates is also evidence of the Discovery Plaintiffs' lack of opportunity for profit or loss.[5]  *Velocity Express*, 2010 U.S. Dist. LEXIS 84973, at *8 ("[T]he degree of control an employer exercises over a worker generally bears an inverse relationship to the degree of control the worker has over her profits or losses[.]"). Specifically, as a result of that control the Discovery Plaintiffs' "opportunity for profit or loss depended more upon [TXX's] provision of work

---

[5] Of course, "one's ability to obtain a discretionary pay raise is not the type of profit-maximizing 'managerial skill' that is characteristic of independent contractor status.  Employees and independent contractors alike may request pay raises.  The profit-maximizing opportunities that are relevant here are those under the worker's control, not subject to the discretion of the worker's supervisor[.]"  *Collinge*, 2015 U.S. Dist. LEXIS 35860, at *18.  Moreover, the fact that TXX exclusively controlled what its customers paid for the deliveries that Discovery Plaintiffs performed and thereby set a cap on Discovery Plaintiffs' pay also reflects Discovery Plaintiffs' lack of opportunity for profit or loss.  *Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217, 1224 (D. Kan. 2008).

[assignments] and [the Discovery Plaintiffs'] own . . . efficiency than their managerial skill." *Scantland*, 721 F.3d at 1316; *see also Collinge*, 2015 U.S. Dist. LEXIS 35860, at *16 ("It appears that the drivers' opportunity for profit or loss depends more upon the jobs to which IntelliQuick assigns them than on their own judgment and industry.  This weighs in favor of economic dependence."); *cf. Saleem*, 854 F.3d at 143 (unlike the Discovery Plaintiffs, who were simply assigned work by TXX, the *Saleem* plaintiffs could choose whether to obtain work from the defendants by "join[ing] a physical queue . . . , offer[ing] assistance to disabled customers seeking prearranged rides . . . , or book into CTG's dispatch system" and toggle between getting work through the defendants, other companies, or independently throughout the course of a day).  "As the Supreme Court has explained, a job whose profits are based on efficiency is 'more like piecework than an enterprise that actually depend[s] for success upon the initiative, judgment or foresight of the typical independent contractor.'"  *Scantland*, 721 F.3d at 1317 (brackets in original); *see also Kan. City Transp. Group*, 2012 U.S. Dist. LEXIS 122047, at *22-23.

As discussed *supra*, TXX controlled the Discovery Plaintiffs' work assignments and required them to take or keep assignments they did not want, at times to the financial detriment of the Discovery Plaintiffs.  TXX has also required Discovery Plaintiffs to make pick ups or drop offs for no compensation.  (CMF ¶¶ 498, 565, 577-78, 629-30.)  To the limited extent that Discovery Plaintiffs could choose to accept or reject work, this does not reflect and opportunity for profit or loss based on managerial skill:

> While the decision to accept or reject work is a type of managerial *action*, the relevant question is whether workers could increase profits through managerial *skill*.  It requires little skill to determine whether one is available at a certain day and time or whether inclement weather or some other factor might make a job less desirable.

*OPDS*, 915 F.3d at 1059 (internal citation omitted).  In any event, Discovery Plaintiffs regularly performed work that they did not want or that they believed paid too little because they needed the income, *i.e.*, they were economically dependent on TXX and relied on TXX "for the opportunity to provide service[.]"  *Superior Care*, 840 F.2d at 1059; *see also Agerbrink*, 787 Fed. Appx. at 25 ("You never turn down a booking. . . . It's crazy to do.") (internal quotation marks omitted).  (CMF ¶¶ 149, 457, 550-51.)

In addition to requiring Discovery Plaintiffs to take assignments they did not want, TXX could and did override the Discovery Plaintiffs' preferences in other ways that impeded the Discovery Plaintiffs' opportunity for profit and loss through the exercise of managerial skill.  TXX could and did veto Discovery Plaintiffs' use of helpers, and TXX has dictated the types of vehicles the Discovery Plaintiffs used.  (CMF ¶¶ 625, 648, 651-53.)  *TXX I*, 663 Fed. Appx. at 89-90.  In fact, multiple Discovery Plaintiffs bought or attempted to buy a particular type of vehicle at TXX's direction.  In some cases, this resulted in Discovery Plaintiffs' wasting their money, as TXX misrepresented the permanence of the work requiring such vehicles.   (CMF ¶¶ 649-50.)

The Discovery Plaintiffs also provided transportation services primarily or exclusively for TXX, and they did so on a full-time basis.  (*Id.* at ¶ 458.)  Given the time commitment required to work for TXX, most Discovery Plaintiffs could not hold other jobs, and those Discovery Plaintiffs who did other work were only able to do so on a part time or sporadic basis around their TXX work.  (*Id.* at ¶ 191.)  *Anderson v. DIRECTTV Inc.*, No. CV 14-02307, 2017 U.S. Dist. LEXIS 215955, at *8 (D. Ariz. July 26, 2017).  Working for TXX therefore "limited [Discovery Plaintiffs'] opportunity for profit from other sources of work."  *Kinney v. Artist & Brand Agency LLC*, No. 13 CV 8864, 2015 U.S. Dist. LEXIS 160465, at *52 (S.D.N.Y. Nov. 24, 2015).

With respect to the Discovery Plaintiffs' investment, "the 'investment,' which must be considered as a factor [in the economic reality test] is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989).  Furthermore, it is appropriate to consider the relative investments of the parties in deciding whether this factor weighs in favor of finding the worker to be an employee. *Keller*, 781 F.3d at 810 ("We agree that courts must compare the worker's investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance."); *see also Snell*, 875 F.2d at 810-811; *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir. 2008); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (5th Cir. 1998).  The Discovery Plaintiffs paid their own work expenses, which were primarily their vehicles and related expenses, such as repairs, maintenance, and gas.  (SUF ¶¶ 311.)  These expenditures pale in comparison to Defendants' extensive investments in TXX's operations, which include, for the years 2010 to 2016, over $23 million on rent, utilities, and employees.  (CMF ¶¶ 715-25.)  Under these circumstances, "the trier of fact should decide how [the plaintiff's] capital investments compared to [the defendant's], and whether [the plaintiff's] capital investments demonstrate that [he] was economically independent." *Keller*, 781 F.3d at 811; *see also*, *e.g.*, *Acosta v. Senvoy, LLC*, No. 16 CV 2293, 2018 U.S. Dist. LEXIS 133295, at *24 (D. Ore. July 31, 2018) ("[H]ere the drivers must invest in a personal vehicle and a cell phone, and pay for a uniform, fuel, and insurance.  These investments are miniscule compared to Defendants' investments . . . . which total about $1.2 million per year."); *Boatner v. MXD Groups, Inc.*, No. 17 CV 801, 2019 U.S. Dist. LEXIS 74004, at *16 (S.D. Ohio May 2, 2019); *Collinge*, 2015 U.S. Dist. LEXIS 35860, at *19-20.

In light of the foregoing, it is clear that a jury could conclude that the opportunity for profit or loss factor weighs in favor of finding the Discovery Plaintiffs to be employees.

### c. Degree of skill and independent initiative

This Court previously recognized that that the Discovery Plaintiffs' work for Defendants did not involve any specialized skill. *Thomas v. TXX Servs.*, No. 13 CV 2789, 2015 U.S. Dist. LEXIS 135027, at *52 (E.D.N.Y. May 22, 2015) ("Driving is not a specialized skill. TXX did not require the Drivers to have a commercial driver's license, and Drivers were not required to demonstrate any level of knowledge upon commencing work for TXX.") (internal quotation marks omitted); *see also Fernandez*, 2018 U.S. Dist. LEXIS 52653, at *16-17 (finding that delivery drivers' work did not require specialized skill); *Kan. City Transp. Group*, 2012 U.S. Dist. LEXIS 122047, at *25 ("[D]rivers . . . were not selected . . . based on their skills[.]"). The job did not require a commercial driver's license. In many cases Discovery Plaintiffs began working for TXX without any prior delivery experience, and they found the job easy to learn. (CMF ¶¶ 453-56.) This "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status." *Lovo*, 2019 U.S. Dist. LEXIS 16824, at *22 (discussing delivery drivers). In arguing to the contrary, Defendants rely on inapposite cases involving drivers who had and used commercial driver's licenses, *DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456, 465 (D. Conn. 2009); *Mikhaylov v. Y & B Transp. Co.*, No. 15 CV 7109, 2019 U.S. Dist. LEXIS 59203, at *17 (E.D.N.Y. Mar. 31, 2019), and cases that acknowledge that driving is generally *not* considered a specialized skill. *Franze v. Bimbo Foods Bakeries Distrib., LLC*, No. 17 CV 3556, 2019 U.S. Dist. LEXIS 110711, at *27 (S.D.N.Y. July 2, 2019) ("[D]riving itself is often not considered a 'special skill[.]'"); *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590, 609 (E.D.N.Y. 2012) (quoting *Campos v. Zoupounidis*, No. 09 CV  1138, 2011 U.S. Dist. LEXIS

22

78905 (D. Conn. July 20, 2011).  In fact, courts routinely find that delivery drivers' jobs do not involve any special skill.  *E.g.*, *Narayan*, 616 F.3d at 903; *Young v. Act Fast Delivery of W. Va., Inc.*, No. 16 CV 9788, 2018 U.S. Dist. LEXIS 682, at \*27 (S.D.W.V. Jan. 3, 2018); *Senvoy, LLC*, 2018 U.S. Dist. LEXIS 133295, at \*25; *Flores*, 250 F. Supp. 3d at 490; *Lewis*, 554 F. Supp. 2d at 1225; *Saleacsi v. Quicksilver Delivery Sys.*, No. 06 CV 1297, 2007 U.S. Dist. LEXIS 88747, at \*23 (M.D. Fla. Nov. 28, 2007).

Nor did the Discovery Plaintiffs' work involve independent initiative.  Rather, as discussed *supra* Section III.B.i., TXX dictated what work the Discovery Plaintiffs had and what TXX paid them for that work.  To the extent that TXX permitted drivers to "bid" on Routes at some point starting in 2013 or later, most Discovery Plaintiffs never bid on work, and the Discovery Plaintiffs obtained virtually no work in response to submitting a "bid."[6]  (CMF ¶¶ 601-16.)  "[P]ursuant to the economic reality test, 'it is not what [Plaintiffs] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.'"  *Saleem*, 854 F.3d at 142 (alteration and emphasis in original).  The most meaningful decisions affecting the Discovery Plaintiffs' economic dependence – which deliveries Discovery Plaintiffs made and what TXX paid for those deliveries – were controlled by TXX, not the Discovery Plaintiffs.  *See supra* Section III.B.i.  *Cf. Superior Care*, 840 F.2d at 1060 ("The nurses in the present case possess technical skills but nothing in the record reveals that they used these skills in any independent way. Rather, they depended entirely on referrals to find job assignments, and Superior Care in turn controlled the terms and conditions of the employment relationship.").  Deciding which streets to take or the order of deliveries are not the types of initiative relevant to the independent contractor analysis. *Lovo*, 2019 U.S. Dist. LEXIS 16824, at \*22-23; *cf. Collinge*, 2015 U.S. Dist. LEXIS 35860, at \*17

---

[6] TXX did not pay the two Discovery Plaintiffs who obtained a Route through bidding the pay rates they bid.  (CMF ¶ 616.)

("[E]ven if Route and Freight Drivers are able to rearrange the order of their deliveries, their ability to realize a profit from this opportunity is constrained by the fact that IntelliQuick decides which deliveries appear on their manifests.").  In any event, the Discovery Plaintiffs contend that they were not free to determine the order of deliveries.  (CMF ¶¶ 25, 660.)  Accordingly, the third *Brock* factor also weighs in favor of employee status.

### d.  Permanence or duration of the working relationship

The permanence and duration of the Discovery Plaintiffs' relationship with TXX weighs in favor of finding them to be employees.

> Generally, independent contractors have variable or impermanent working relationships with the principal company because they "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration."

*Keller*, 781 F.3d at 807 (quoting *Baker*, 137 F.3d at 1442).  The Discovery Plaintiffs worked for Defendants for between two and a half to 24 years, and most of them worked for TXX for over 10 years.  (CMF ¶¶ 430-51.)  Discovery Plaintiffs also worked the same Routes for extended periods of time.  (*Id*. at ¶ 535.)  Working for TXX was the Discovery Plaintiffs' primary or only job.  (*Id*. at ¶ 458.)  These facts are consistent with employee status.  *ODPS*, 915 F.3d at 1057-59 (consistent work over years for putative employer weighs in favor of employee status, even where plaintiffs had other jobs); *Landaeta*, 2014 U.S. Dist. LEXIS 27677, at *15-16.

Defendants' focus on the Discovery Plaintiffs' contract terms and termination provisions is misplaced.  (Defs.' Mem. at 21.)  Defendants' own witnesses have admitted that the relationship between TXX and the Discovery Plaintiffs is, in practice, of indefinite length.  (Pagano Ex. 34 129:15-22.)  And the Discovery Plaintiffs in fact worked for TXX for years and kept the same Routes for years.  (CMF ¶¶ 430-51, 535.)  This reality, rather than the technical contract term, is

24

what is pertinent to the economic reality analysis,[7] *Saleem*, 854 F.3d at 142, and it clearly indicates that Discovery Plaintiffs were employees, not independent contractors. *Narayan*, 616 F.3d at 903 ("Here, the plaintiff Drivers worked at EGL for several years, and their Agreements were automatically renewed. This was not a circumstance where a contractor was hired to perform a specific task for a defined period of time. There was no contemplated end to the service relationship at the time that the plaintiff Drivers began working for EGL."); *Scantland*, 721 F.3d at 1318; *Lewis*, 554 F. Supp. 2d at 1225 ("The record contains no evidence that ASAP hired plaintiff for a fixed employment period, and plaintiff understood that his agreement with ASAP was not limited in duration, which suggests employee status.").

### e. The Discovery Plaintiffs' work is an integral part of TXX's business

This Court previously recognized that the Discovery Plaintiffs' work is integral to TXX's business. *Thomas*, 2015 U.S. Dist. LEXIS 135027, at *54. TXX's customers pay it for deliveries, and TXX's contracts with its customers are for delivery services. (CMF ¶¶ 470-71.) TXX president John Hunt described TXX's responsibility as "find[ing] people, companies, that will make these deliveries in a timely fashion." (*Id.* at ¶ 474.) TXX's profit is the difference between what its customers pay TXX for these deliveries and what TXX pays the Discovery Plaintiffs and other drivers to make those deliveries. (*Id.* at ¶ 476.) TXX's self-characterization as a "broker" does not change this analysis.[8] *ODPS*, 915 F.3d at 1055 (finding plaintiffs' work integral to

---

[7] Notably, the Discovery Plaintiffs who no longer work for TXX did not comply with the termination provisions of their contracts. (CMF ¶ 39.) To the extent their contracts technically remain in effect because neither TXX nor the Discovery Plaintiffs submitted a written termination to the other party, it is clear that those contracts have no practical impact on the current relationship between TXX and the Discovery Plaintiffs who no longer work for TXX.

[8] TXX was not even licensed to act as a broker until August 27, 2010. (Schulman Ex. 39.) Prior to that time, TXX was registered with the Federal Motor Carrier Safety Administration as a motor property common carrier, which is a type of motor carrier. (Schulman Ex. 40.) Federal Motor Carrier Safety Administration, Application for Motor Property Carrier and Broker Authority: Instructions for Form OP-1 at vii, https://cms8.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/docs/registration/2201/op-1-form-5-15-2019-508.pdf (accessed Feb. 3, 2020). TXX's motor property common carrier registration appears to remain active. (Schulman Ex. 40.)

defendant's business even though defendant characterized itself as "an agent between its customers and" plaintiffs because defendant "could not function without the services its workers provide"); *Boatner*, 2019 U.S. Dist. LEXIS 74004, at *21 ("[C]ourts have not been persuaded by defendants' arguments that they merely serve as an agent between customers and service provider."); *Senvoy, LLC*, 2018 U.S. Dist. LEXIS 133295, at *26-27 (finding drivers integral to defendant that contended that it "merely arrange[d] for the transportation of customers' packages and freight, but [did] not actually provide delivery services itself" because "without drivers, [defendant] would have no business").

Contrary to Defendants' assertions (Defs.' Mem. at 22), whether or not the Discovery Plaintiffs are easily replaceable is not relevant in evaluating this factor.

> When evaluating . . . the extent to which Plaintiff's work was integral to Defendants' business[,] "[t]he question is not whether [P]laintiff's individual services were essential to the business, but whether the type of work performed by [P]laintiff was integral to [the business].' Where a plaintiff is engaged in a company's primary business, this factor supports a finding of employee status.

*Kinney*, 2015 U.S. Dist. LEXIS 160465, at *58; *Gayle v. Harry's Nurses Registry, Inc.*, No. 07 CV 4672, 2009 U.S. Dist. LEXIS 17768, at *27 (S.D.N.Y. Mar. 9, 2009) (same); *see also, e.g.*, *Donovan v. Dialamerica Marketing, Inc.*, 757 F.2d 1376, 1385 (3d Cir. 1985) ("[W]orkers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer."); *Dixon v. Zabka*, No. 11 CV 982, 2014 U.S. Dist. LEXIS 159692, at *73-74 (D. Conn. Nov. 13, 2014) (finding that this factor weighed in favor of employee status even where defendants argued that the workers' work was "interchangeable and easily replaceable"); *Lewis*, 554 F. Supp. 2d at 1225. When analyzing the *Brock* factors collectively, Defendants' argument that replaceability is a relevant consideration is illogical. The replaceability of a worker naturally increases as the level of skill required (the third *Brock* factor) decreases because more people are

26

able to perform low skilled work.  Thus, if replaceability were relevant to whether one's work is integral to the business, the third and fourth *Brock* factors would essentially neutralize each other. Accordingly, a workers' replaceability should not be considered as part of the fourth *Brock* factor.

Because TXX's drivers' work is integral to Defendants' business, this factor weighs heavily in favor of finding the Discovery Plaintiffs to be Defendants' employees.  *ODPS*, 915 F.3d at 1055 ("The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship."); *Young*, 2018 U.S. Dist. LEXIS 682, at *27; *Bobbitt*, 2013 U.S. Dist. LEXIS 150854, at *31-32.

### f.   Totality of the circumstances

As set forth above, there are factual disputes concerning how the Discovery Plaintiffs got assignments, how their pay rates were established, and all of the *Brock* factors.  Viewed in the light most favorable to Plaintiffs, a jury easily could find that the Discovery Plaintiffs were employees, and Defendants are not entitled to summary judgment on Plaintiffs' FLSA claims.  *TXX I*, 683 Fed. Appx. at 90.

### C.  A Reasonable Jury Could Find That The Discovery Plaintiffs Were Employees Under The NYLL

Based on the same facts and similar analysis described above, summary judgment is also inappropriate under the NYLL.  Most significantly, the disputes discussed *supra* regarding the degree of control TXX exercised, whether TXX set rules for Discovery Plaintiffs, whether Discovery Plaintiffs were free to reject assignments, and whether Discovery Plaintiffs could control their schedules were all present in *TXX I*, in which the Second Circuit found summary judgment on the NYLL claims inappropriate.  663 Fed. Appx. at 89-90.

Under the NYLL, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results

produced or the means used to achieve the results." *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003) (internal citations omitted).  Relevant factors (the "*Bynog* factors") include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule. *Id*. "These factors, however, are not exhaustive: New York courts commonly consider additional factors." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013).  Moreover, "[t]here is general support for giving FLSA and the New York Labor Law consistent interpretations[.]" *Id*. at 924; *Agerbrink*, 787 Fed. Appx. at 26 n.2.  Indeed, in *TXX I*, the Second Circuit conducted a single analysis for the FLSA and NYLL claims.  663 Fed. Appx. at 89-90. "[T]here appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Hart*, 967 F. Supp. 2d at 924.

Many of the factual disputes discussed *supra* bear directly on the *Bynog* factors.  Plaintiffs have set forth significant evidence that they did not work at their own convenience including, *inter alia*, that Defendants set start times, could and did penalize drivers for arriving late or missing work, required Discovery Plaintiffs to work certain days and times, and required Discovery Plaintiffs to spend hours working in TXX's warehouse in the morning.  (CMF ¶¶ 563, 631-35, 646-47.)  Defendants' rules and the practicalities of Discovery Plaintiffs' work assignments did not allow the Discovery Plaintiffs to take meaningful breaks, and Plaintiffs had to get permission from TXX to take time off.  (*Id*. at ¶¶ 638, 641-42.)  By compiling Routes and assigning Routes and Specials, TXX imposed further constraints on the Discovery Plaintiffs' schedules.  (*Id*. at ¶¶ 501, 505-507, 509, 524-29, 534-41, 638.)  Moreover, TXX required Plaintiffs to take certain assignments and punished them for refusing or attempting to refuse certain assignments.  (*Id*. at ¶¶ 540, 549-53, 647.)  This is more than sufficient to support a finding that Discovery Plaintiffs did

28

not work at their own convenience.  *See Landaeta*, 2014 U.S. Dist. LEXIS 27677, at *18; *Anikushina v. Moodie*, 58 A.D.3d 501, 501-502, 504 (N.Y. App. Div. 1st Dep't 2009); *Williams v. One Call Motor Freight Inc.*, No. 115466/2005, 2010 N.Y. Misc. LEXIS 4093, at *11 (Sup. Ct. N.Y. County Aug. 25, 2010).

Defendants exercised further control over Discovery Plaintiffs' schedules by requiring them to arrive to work at a certain time and punishing them for failing to do so.  (CMF ¶¶ 631-35.) The Discovery Plaintiffs also worked the same Routes – and thus the same schedules for years. (CMF ¶¶ 535.)  Accordingly, a jury could also find that the Discovery Plaintiffs worked a fixed schedule.  *See Williams*, 2010 N.Y. Misc. LEXIS 4093, at *11; *see also Velocity Express*, 2010 U.S. Dist. LEXIS 84973, at *17.

While it is undisputed that Defendants did not provide drivers with benefits or put them on payroll, the fact that it was TXX's unilateral decision to do this makes these factors "unimportant." *Hart*, 967 F. Supp. 2d at 925.  Drivers did not receive benefits and were not on payroll because Defendants classified them as independent contractors.  *Id*. ("To assign this factor much weight would effectively allow any employer to control, under New York law, a worker's status simply by labeling her an independent contractor and denying her employee benefits.  But employee status under the NYLL turns on substance, not form."); *Anikushina*, 58 A.D.3d 501 (finding triable issues of fact regarding employee status where putative employee did not receive benefits, and his compensation was reported on an IRS Form 1099 and was not subject to payroll tax withholdings).

For similar reasons, the fact that Discovery Plaintiffs filed tax returns as independent contractors and claimed business deductions is not meaningfully probative – much less dispositive – of independent contractor status.  "It would be a bold worker indeed who, notwithstanding the fact that she is paid as an independent contractor, nevertheless files her taxes as an employee,

thereby exposing her employer to potential tax liabilities." *Agerbrink v. Model Serv. LLC*, No. 14 CV 7841, 2017 U.S. Dist. LEXIS 33249, at *18-19 (S.D.N.Y. Mar. 8, 2017); *see also Hart*, 967 F. Supp. 2d at 924 ("[I]t is not significant [under the NYLL] how the parties defined the employment relationship or how the worker identified herself on tax forms."); *In re Magdylan*, 172 A.D.3d 1832, 1834 (N.Y. App. Div. 3d Dep't 2019) ("[T]he fact that claimant considered herself an independent contractor for tax purposes and deducted expenses on her tax returns as if she was self-employed is not dispositive."); *Shanley v. Louise Blouin Media, Inc.*, No. 151232/2014, 2018 N.Y. Misc. LEXIS 5629, at *15-16 (Sup. Ct. N.Y. County Nov. 26, 2018); *Hernandez v. Chefs Diet Delivery, LLC*, 81 A.D.3d 596, 599 (N.Y. App. Div. 2d Dep't 2011).

Additional relevant facts – both disputed and undisputed – beyond the delineated *Bynog* factors also show that the Discovery Plaintiffs were employees under New York law.  Under the Second Circuit's recent decision in *Agerbrink v. Model Serv., LLC*, the disputes discussed *supra* Section III.B.i as to how Discovery Plaintiffs got job assignments and how their pay rates were set preclude summary judgment on the New York claims.  787 Fed. Appx. at 26 n.2.  The facts that TXX created the Discovery Plaintiffs' Routes, controlled the customer relationship, and provided recordkeeping and invoicing services are also sufficient to defeat Defendants' motion as to the New York claims.  (CMF ¶¶ 470, 479, 481-82, 501, 505-506, 509, 536-40, 555, 658, 681, 700-705; SUF ¶ 13.)  *Meyer v. Martin*, 16 A.D.3d 632, 634 (N.Y. App. Div. 2d Dep't 2005).  TXX's supervision, monitoring, and discipline of the Discovery Plaintiffs, discussed *supra*, are further evidence that they were TXX's employees.  *Williams*, 2010 N.Y. Misc. LEXIS 4093, at *11; *Landaeta*, 2014 U.S. Dist. LEXIS 27677, at *19-20.

Thus, considering the totality of the Discovery Plaintiffs' evidence, a jury could easily find that Defendants exercised sufficient control over the Discovery Plaintiffs to render them

employees.  The factual disputes in this case are similar to those in cases where courts have found triable issues of fact regarding employee status under New York law.[9]  *See*, *e.g.*, *Anikushina*, 58 A.D.3d 501; *Bermudez v. Ruiz*, 185 A.D.2d 212 (N.Y. App. Div. 1st Dep't 1992), *Williams*, 2010 N.Y. Misc. LEXIS 4093.  The facts in this case are also similar to or stronger than those in unemployment insurance appeals where workers were found to be employees under the same control test applicable to the Discovery Plaintiffs' NYLL claims.  *E.g.*, *In re Kelly*, 28 A.D.3d 1044 (N.Y. App. Div. 3d Dep't 2006) (driver found to be employee where he used his own vehicle, paid his own expenses, told the employer when he was available to work and was never required to work, was allowed to work for the employer's competitors, had a choice of two geographic zones for deliveries, was required to make all deliveries within a reasonable time on the same day, had to obtain signatures for delivery, reported delivery times to employer, had to be polite and well-mannered, and the employer set the pay rate); *see also In re Fecca*, 171 A.D.3d 1423 (N.Y. App. Div. 3d Dep't 2019); *In re CDK Delivery Serv., Inc.*, 151 A.D.2d 932 (N.Y. App. Div. 3d Dep't 1989).  Accordingly, Defendants are not entitled to summary judgment on the NYLL claims.

### D. A Reasonable Jury Could Find That Patricia Hunt Was The Discovery Plaintiffs' Employer

Individual defendants are liable for FLSA and NYLL violations if they are employers. *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) (FLSA); *Bonito v. Avalon Partners, Inc.*, 106

---

[9] Defendants' invocation of the New York Unemployment Appeals Board's finding that Discovery Plaintiff Joseph Morris was an independent contractor is misplaced.  This Court previously recognized that unemployment insurance decisions "lack[] preclusive effect in a subsequent action or proceeding" and "afforded no weight" to such decision. *Thomas*, 2015 U.S. Dist. LEXIS 135027, at *40.  This position makes sense in light of the substantial evidence standard that applies to unemployment proceedings, under which a decision will not be reversed on appeal as long as it is supported by substantial evidence, even if the record would also support a contrary finding.  *In re Magdylan*, 172 A.D.3d at 1832, 1834.  Moreover, the record in this case is very different from that in the Morris unemployment matter, and there are several contradictions between the testimony of Defendants' representatives at Morris' unemployment hearing and in this case.  (*E.g.*, *compare* CMF ¶ 596 *with id*. at ¶ 598; *compare id*. at ¶ 599 *with id*. at 600.)  Accordingly, this motion should be decided based on the record in this case, without regard to the outcome of Morris' unemployment insurance application.

A.D.3d 625 (N.Y. App. Div. 1st Dep't 2013) (NYLL).  To determine whether an individual is an employer under the FLSA, "the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (internal citation omitted).  The NYLL standard is similarly focused on control.  *Flanigan v. Vulcan Power Group, LLC*, 642 Fed. Appx. 46, 51 (2d Cir. 2016).

Under both the FLSA and NYLL, courts consider the "*Carter* factors," which are "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry*, 722 F.3d at 104 (internal quotation marks omitted); *Flanigan*, 642 Fed. App'x at 51; *Bonito*, 106 A.D.3d at 626.  Under the FLSA, a court should also consider whether the alleged employer has operational control over employees.  "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Irizarry*, 722 F.3d at 110.

Factual disputes concerning Patricia Hunt's role at TXX preclude summary judgment on the claims against her.  Most significantly, P. Hunt made the decision to classify drivers, including the Discovery Plaintiffs, as independent contractors.  Before she made that decision, TXX classified its drivers as employees.  (CMF ¶ 727.)  Thus, P. Hunt made the very classification decision that is the basis of the claims in this action.  That decision reflects P. Hunt's operational control, because her decisions "direct[ly] affected the nature or conditions of [Discovery Plaintiffs'] employment[.]" *Irizarry*, 722 F.3d at 110; *see also Inclan v. N.Y. Hosp. Group, Inc.*, 95 F. Supp. 3d 490, 509-510 (S.D.N.Y. 2015) (setting relevant pay policy is evidence of

operational control); *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 (S.D.N.Y. 2010) (defendant's involvement in establishing the policy at issue is indicative of employment status, even when it occurred "well outside the [statute of] limitations period").  It also reflects her control over the Discovery Plaintiffs' method of payment and conditions of employment, two of the *Carter* factors. *See Herman*, 172 F.3d at 140 (deciding to stop classifying workers as independent contractors is control over the method of payment); *Inclan*, 95 F. Supp. 3d at 510.

P. Hunt has remained actively involved in the continued classification of Discovery Plaintiffs as independent contractors.  When Named Plaintiff John Dean was awarded unemployment insurance benefits, P. Hunt took a leading role in appealing that decision, reflecting her ongoing operational control of TXX.  (CMF ¶¶ 728-32.)  *See Inclan*, 95 F. Supp. 3d at 509 (owner's involvement in responding to wage and hour lawsuit is indicative of operational control). P. Hunt testified under oath at Dean's unemployment insurance hearing that over the course of two or two and half weeks, she personally prepared a letter to the Department of Labor outlining why TXX believed Dean was an independent contractor.  (CMF ¶¶ 729-31.)  P. Hunt did this herself "because [she] felt that it was that important."  (Schulman Ex. 32 at Dean248.)  Remarkably, P. Hunt later testified at deposition in this case that she had never before seen that very letter which, at Dean's unemployment hearing, she testified under oath that she wrote.  (CMF ¶¶ 731-33.)  This contradictory and self-serving testimony calls into serious question the veracity of P. Hunt's testimony in this case that she has not been actively involved in managing TXX since 2001.  (SUF ¶¶ 423-29.)  Accordingly, a jury would not be required to believe P. Hunt's testimony to that effect, and it should be disregarded on this motion.  *See Jasco Tools, Inc. v. Dana Corp.*, 574 F.3d 129, 152-54 (2d Cir. 2009); *cf. Morales v. M. Alfonso Painting Corp.*, No. 11 Civ. 1263, 2013 U.S.

33

Dist. LEXIS 134219, at *12-13 (S.D.N.Y. Sep. 19, 2013) (summary judgment improper where testimony "raises serious questions of fact and credibility.").

Moreover, at the Dean unemployment hearing, TXX controller Louis Echevarria testified that P. Hunt was his "superior[,]" that "[he] work[s] for her[,]" and that he and P. Hunt work in the same TXX location.  (CMF ¶¶ 734-36.)  This testimony further reflects P. Hunt's operational control and active management of TXX and directly contradicts Defendants contention that P. Hunt is "[n]ot . . . involved in the operations of TXX[.]"  (Defs.' Mem. at 25.)  In fact, for much of 2019 P. Hunt was present at TXX's Hauppauge location on an almost daily basis.  (CMF ¶ 742.) P. Hunt has also signed contracts with TXX's customers, communicates with customers, and has the authority to sign checks on behalf of TXX, all of which is further evidence of her operational control.  (*Id*. at ¶¶ 738-40.)  As is most relevant here, P. Hunt signed checks to CANE, the company that TXX used to pay the Discovery Plaintiffs for their work for several years, which demonstrates both her operational control and her control over the method of paying the Discovery Plaintiffs. (*Id*. at ¶ 740.)  *Herman*, 172 F.3d at 137; *Meidenbauer v. Zenith Acquisition Corp.*, No. 13 CV 00799, 2018 U.S. Dist. LEXIS 82738, at *39 (W.D.N.Y. May 15, 2018).

The Discovery Plaintiffs have also proffered evidence that P. Hunt has control over their pay rates, work assignments, and conditions of employment.  When Discovery Plaintiff Grant asked a dispatcher for an increased pay rate, the dispatcher told him he would have to check with P. Hunt.  Later, presumably after consulting with P. Hunt as he stated he would do, the dispatcher told Grant that Grant's pay rate would actually decrease rather than increase, and that decrease in fact took effect.  (CMF ¶ 575.)  This chain of events suggests that P. Hunt is involved in determining the Discovery Plaintiffs' rates of pay.  *See Ho v. Sim Enters.*, No. 11 Civ. 2855, 2014 U.S. Dist. LEXIS 66408, at *30 (S.D.N.Y. May 14, 2014).  TXX has also distributed to Discovery

34

Plaintiffs memos from P. Hunt regarding administrative fee increases – which resulted in Discovery Plaintiffs' income decreasing – and total annual compensation, further reflecting her control over the Discovery Plaintiffs' pay.  (CMF ¶ 741.)

In 2019, Discovery Plaintiff Armstrong complained to P. Hunt that several of his stops were taken away from him.  After that conversation, Armstrong got one of his stops back, indicating that P. Hunt can exercise control over Discovery Plaintiffs' work assignments.  (CMF ¶ 743.)  *McGlone v. Contract Callers, Inc.*, 49 F. Supp. 3d 364, 375 (S.D.N.Y. 2014) (the ability to redress employee complaints "affect[s] the schedules and conditions of Plaintiffs' employment").  Such control, even if exercised only occasionally, is indicative of employer status. *Herman*, 172 F.3d 132 at 139, 140 ("Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence.") (internal quotation marks and alterations omitted).  Finally, P. Hunt also issued a memo to Discovery Plaintiffs regarding Department of Motor Vehicles checks on drivers, which shows that she had an active role in supervising the conditions of their employment.  (CMF ¶ 741.)

As Plaintiffs have presented evidence that P. Hunt had operational control and satisfied three of the four *Carter* factors, a jury could easily find that P. Hunt was the Discovery Plaintiffs' employer under the FLSA and NYLL.  *See, e.g.*, *Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 255-258 (E.D.N.Y. 2015); *Ramirez v. Riverbay Corp.*, 35 F. Supp. 3d 513, 521-22 (S.D.N.Y. 2014). Therefore, summary judgment is inappropriate.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: New York, New York          /s/ Denise A. Schulman
       February 10, 2020              Denise A. Schulman
                            D. Maimon Kirschenbaum
                            JOSEPH & KIRSCHENBAUM LLP
                            32 Broadway, Suite 601
                            New York, NY 10004
                            212-688-5640

                            *Attorneys for Plaintiffs and Opt-In Plaintiffs*