UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
CECIL THOMAS and JOHN DEAN, on behalf
of themselves and all others similarly situated,

                                  Plaintiffs,

    -against-

TXX SERVICES, INC. and PATRICIA
DOUGAN HUNT,

                                  Defendants.

-----------------------------------------------------------------x

**MEMORANDUM AND
ORDER**
13-cv-2789 (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

In this wage and hour employer-independent contractor misclassification litigation, Plaintiffs Cecil Thomas and John Dean, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), all of whom provided freight delivery services, commenced this class action, by way of Complaint filed on May 9, 2013, against their services broker TXX Services, Inc. ("TXX" or the "Company") and Patricia Dougan Hunt, one of TXX's shareholders ("Hunt" and together with TXX, "Defendants"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* and the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 191, 193, 195, 198 and 650, *et seq.*, as well as related New York State Department of Labor regulations.  *See* Complaint ("Compl."), Docket Entry ("DE") [1].  Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56.1.  *See* DE [264].  For the reasons set forth below, the motion is denied.

## I.     BACKGROUND

### A.     <u>Relevant Facts</u>

The following facts are taken from the parties' pleadings, declarations, exhibits and respective Local Civil Rule 56.1(a) statements.  Unless otherwise noted, these facts are not in dispute.

TXX is a licensed property broker of transportation, with a license issued by the United States Department of Transportation, Federal Motor Carrier Safety Administration, and has authority to engage in operations in foreign or interstate commerce as a broker, arranging for the transportation of freight other than household goods by motor vehicle ("freight").  *See* Defendant's Statement of Uncontested Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1"), DE [264-1], ¶ 4; Plaintiffs' Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1"), DE [265-1], ¶4; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp."), DE [265], 2.  As part of its business, the Company brokers the provision of transportation services for a drug distribution network handling the transportation of certain freight, including pharmaceuticals and controlled substances, by engaging Transportation Service Providers ("TSPs"), including Plaintiffs.  *See* Def. 56.1 ¶¶ 5-6.

Defendants maintain that TSPs deliver freight subject to government regulations and requirements, including those of the Drug Enforcement Agency ("DEA"), while Plaintiffs counter that most of the freight they delivered did not contain controlled substances.  *See id.* ¶ 11; Pl. 56.1 ¶ 18.  In any event, TSPs retrieve

2

the freight from TXX's secure location and are responsible for delivering the freight to the Defendants' customers. *See* Def. 56.1 ¶ 7.

Over the last 17 years, the TSPs, including some Plaintiffs, entered into a variety of independent contractor agreements with TXX. Between 2004 and 2007, some TSPs entered into Independent Contractor Applications and Agreements with the National Independent Contractors Association ("NICA"), a third party entity, by which they acknowledged they were independent contractors providing contracted services and related activities and pursuant to which NICA, not TXX, paid the TSPs' invoices. *See id.* ¶¶ 28-29. The TSPs provided services to TXX under those agreements. *See id.* ¶ 29. Such agreements were set to terminate when the independent contractor stopped performing services for the NICA-affiliated company, such as TXX. *See id.* ¶ 40.

Between 2007 and 2008, certain TSPs, again including some Plaintiffs, entered into independent driver service agreements with Contractor Associates of the Northeast, Inc. ("CANE"), a separate third party entity, as "self-employed Independent Contractor[s]," pursuant to which CANE, not TXX, paid the TSPs' invoices. Again, the TSPs provided services to TXX pursuant to these agreements. *See id.* ¶¶ 32-34. CANE independent driver agreements could be terminated by either party upon one day's written notice to the other. *See id.* ¶ 41.

Other TSPs, including some Plaintiffs, entered into owner/operator agreements with CANE between 2009 and 2010, and between 2010 and 2015, additional TSPs, including some Plaintiffs, entered into owner/operator agreements

3

with TXX alone as the contracting company, which set forth virtually identical terms as the CANE owner/operator agreements. *See id.* ¶¶ 35, 37. CANE and TXX owner/operator agreements lasted 90 days, subject to renewals, unless either party terminated them. *See id.* ¶¶ 42-43. Under the CANE and TXX agreements, the owner/operators, which included Plaintiffs, agreed that no employer/employee relationship existed, TSPs could accept or reject assignments and there was no minimum or maximum number of hours to be worked per day or week and no set hours of work. *See id.* ¶¶ 38, 218-20, 379-82; Pl. 56.1 ¶¶ 379-82. Consistent with this provision, these agreements further stated that TSPs were responsible for purchasing their own vehicles, paying any tickets for violations of laws, rules or regulations related to their driving, and paying their own vehicle insurance and other expenses incurred through their work with the Company. *See* Pl. 56.1 ¶¶ 45, 311; Def. 56.1 ¶ 323.

When TSPs entered into a CANE owner/operator agreement between 2009 and 2010, they also signed independent owner-operator review forms, which notified TSPs that they were self-employed business owners, not employees. *See* Pl. 56.1 ¶¶ 46-47; Def. 56.1 ¶¶ 46-47. Those TSPs that entered into a TXX owner/operator agreement between 2010 and 2015 signed similar review forms. *See* Pl. 56.1 ¶ 49; Def. 56.1 ¶ 49 . Plaintiffs concede that most TSPs who worked for TXX prior to 2010, as a result of their non-employee designation, opened bank accounts separate from their personal accounts to conduct business, and that once they began to work for the Company through business entities, they opened separate business bank accounts. *See* Def.

56.1 ¶¶ 51-52; Pl. 56.1 ¶¶ 51-52.  Moreover, TSPs often maintained home offices in relation to their business with TXX.  *See* Def. 56.1 ¶ 53; Pl. 56.1 ¶ 53.

TXX did not withhold employee payroll taxes or provide benefits to Plaintiffs, nor did it ever provide Plaintiffs with a company handbook, paid holidays or vacations.  *See* Def. 56.1 ¶¶ 58, 64, 67.  The Company provided TSPs with form 1099's and not form W-2's for tax purposes.  *See id*. ¶¶ 394-96.  Accordingly, certain TSPs deducted the costs of lunches and other business expenses on their tax returns.  *See id*. ¶¶ 260, 391-93.  Further, the TXX employee handbook, by its terms, is inapplicable to TSPs and reminds employees that the Company engages owners/operators on independent contractor bases to provide transportation services.  *See id*. ¶¶ 384-90; Pl. 56.1 ¶¶ 384-90.  The vehicles and other assets the TSPs utilized were not supplied, owned or controlled by TXX, nor did they bear the Company's identification, but only the name and address of the TSPs.  *See* Def. 56.1 ¶¶ 81-83.

TSPs were not, at the time of filing, required to wear uniforms, even when TXX occasionally distributed shirts with its logo, although they did receive Company identification badges to allow entrance and exit from the TXX transfer location and in the event they were stopped by the police.  *See id*. ¶¶ 324, 334, 340.  Plaintiffs recall that TXX required them to wear uniforms identifying them as TXX agents until 2012 or 2013, and has, at times, instructed TSPs as to the types of vehicles they needed to use in connection with their work for the Company.  *See* Pl. 56.1 ¶¶ 63, 76, 326, 712-14.  TXX authorized TSPs to utilize more than one vehicle for TXX deliveries, and some used their own hand trucks or other equipment in the course of their work.

*See* Def. 56.1 ¶¶ 120, 310.  Some TSPs utilized "helpers" in their work contracted for with TXX, including friends and relatives, all of whom were required to submit photo identification to the Company and whom the TSPs were to pay.  *See id.* ¶¶ 85, 106, 121, 142, 276.  To comply with DEA and other government requirements as to recordkeeping concerning the transportation of controlled substances, the Company secured copies of the TSPs' vehicle registrations, drivers' licenses and other materials in the event of a government-required audit.  *See id.* ¶ 98.  Some TSPs provided transportation services to multiple shippers, both acquired through TXX and not.  *See id.* ¶¶ 357-59.  Further, certain TSPs occasionally made deliveries for companies other than TXX or engaged in other business activities while working for TXX, and others stopped working for TXX in part or whole to find better paying jobs elsewhere.  *See id.* ¶¶ 148, 192, 209, 213-15.

Plaintiffs admit that for a period of time, TSPs could bid for transportation services jobs through the TXX website, but argue that at least some of the TSPs never actually bid.  *See id.* ¶¶ 146, 150; Pl. 56.1 ¶¶ 146, 150.  The Company sent mass text messages to TSPs who opted to receive them, some of which referenced work available for bidding.  *See* Def. 56.1 ¶ 156.  TXX paid Plaintiffs for some work based on stops and for others based on the route or area.  *See id.* ¶ 174.  Some TSPs entered into arrangements with the Company confirming revenue to be generated for their work.  *See id.* ¶ 177.  TSPs were permitted to, and in some cases did, develop and utilize promotional materials such as business cards.  *See id.* ¶ 372.

Some deliveries required the use of a scanner, although the parties disagree as to whether TSPs bought scanners independently or rented them from TXX.  *See id.* ¶¶ 232-33; Pl. 56.1 ¶¶ 232-33.  As to the order and manner of delivery, the CANE and TXX owner/operator agreements directed that only the "result" was of importance rather than the method by which the result was achieved, and as such, TSPs were free to select their own routes and the order of their deliveries.  *See* Pl. 56.1 ¶ 249; Def. 56.1 ¶ 249.  Thus, under those agreements, the TSPs controlled the method of how they provided transportation services.  *See* Pl. 56.1 ¶ 283; Def. 56.1 ¶ 283.  The agreements also directed that TSPs were required to find replacements to make their deliveries in the event they were unable or unavailable to complete them.  *See* Pl. 56.1 ¶¶ 254-55; Def. 56.1 ¶¶ 254-55.

While Plaintiffs concede the language of the various independent contractor agreements, they argue that the reality of the TSPs' relationships to TXX was more akin to those of employees-employers.  For instance, Plaintiffs point to the Company's supervision and direction on much of the TSPs' work, including how to load their vehicles, how to complete paperwork and how to use electronic scanners.  *See* Pl. 56.1 ¶ 654.  TXX supervisors occasionally accompanied drivers on new routes, followed TSPs to monitor performance and directed Plaintiffs on the order in which they needed to make deliveries, as well as contacted them while on their routes to provide additional assignments, check on delivery times and address mistakes.  *See id.* ¶¶ 654-75.  In several instances, TXX monitored replacement drivers and vetoed some of the TSPs' use of helpers.  *See id.* ¶¶ 97, 625, 676-80.  Defendants composed the

7

TSPs' routes and pay rates, and have prohibited drivers from making extra stops, as well as reprimanded them for rejecting assignments, asking for higher pay, making errors and not following delivery schedules precisely, including in meetings with drivers. *See id.* ¶¶ 236-37, 540, 551, 558, 561, 575-78, 631-35, 663-64, 684-705.

Certain TSPs developed relationships with representatives of the retailers to whom they delivered freight and provided some retailers with their cell phone numbers or called such retailers when they were running late. *See id.* ¶¶ 284-87. When issues arose as to freight, shippers and retailers were free to contact either the Company, who in turn might contact the TSPs, or the TSPs individually. *See id.* ¶ 347; Def. 56.1 ¶ 347. Retailers have complained to TSPs, as well as provided TSPs with gifts. *See id.* ¶¶ 291-92. The TXX owner/operator review forms TSPs signed at or around the time they entered into owner/operator agreements direct that TSPs handle all complaints from customers. *See* Pl. 56.1 ¶ 297; Def. 56.1 ¶ 297. Plaintiffs, however, argue the Company controlled customer relations, noting that customers often preferred to correspond with TXX and that the Company's secure facilities often created situations in which TSPs could not have made deliveries for certain customers other than through TXX. *See* Pl. 56.1 ¶¶ 16, 470; Def. 56.1 ¶ 6.

TXX provides TSPs with an invoice reflecting a record of services provided in a certain period, which the TSPs can correct or accept. *See* Def. 56.1 ¶¶299-300; Pl. 56.1 ¶¶ 299-300. The Company charges TSPs administrative fees to reflect the cost of DEA and other governmental requirements, as well as recordkeeping obligations,

providing a chain of custody, security and accounts payable, but does not deduct federal, state or local taxes from TSPs' revenues. *See* Def. 56.1 ¶¶ 305, 307.

Hunt is the TXX CEO and a 12 percent stockholder. *See id.* ¶ 423. The parties disagree as to her role as it relates to TXX operations. *See id.* ¶¶ 423-29; Pl.. 56.1 ¶¶ 423-29. Defendants maintain that Hunt's responsibilities as CEO are limited to reporting the Company's expenses to the TXX Board of Directors and performing monthly expense reviews. *See* Def. 56.1 ¶ 424. According to Defendants, Hunt has not actively participated in the Company's operations as to TSPs or otherwise since 2001, and does not participate in TXX's day-to-day operations nor its accounts payable department. *See id.* ¶¶ 425-428. Plaintiffs counter that it was Hunt who decided to classify the Company's drivers as independent contractors instead of employees, and that her responsibilities are far more wide-reaching and include communications with TXX customers, signing contracts and checks on behalf of the Company and drafting memoranda that TXX distributed to employees regarding procedures and policy changes affecting TSPs. *See* Pl. 56.1 ¶¶ 424, 726-27, 737-43. Hunt opposed one driver's employment insurance application in 2012, submitting a letter to the New York Department of Labor explaining that the individual was an independent contractor not entitled to benefits, and testified at the unemployment insurance hearing. *See id.* ¶¶ 728-33. Other TXX employees have referred to Hunt as their "superior." *See id.* ¶¶ 734-36.

B.      **Procedural History**

On May 9, 2013, Plaintiffs filed their Complaint requesting declaratory judgment and monetary damages against Defendants. *See generally* Compl. In Plaintiffs' first cause of action, they assert that they were TXX employees under the FLSA, and that the Company failed to pay Plaintiffs overtime wages for hours worked in excess of 40 per week. *See id.* ¶¶ 75-81. Plaintiffs further allege in their second, third and fourth causes of action, respectively, that Defendants violated the NYLL by failing to pay Plaintiffs overtime wages and commissions, and failing to provide state-mandated wage notices. *See id.* ¶¶ 82-97. Defendants answered the Complaint on July 3, 2013, *see* DE [67], and on November 5, 2013, filed a motion for judgment on the pleadings. *See* DE [83]. Judge Feuerstein referred that motion to United States Magistrate Judge Wall, previously assigned to this matter. *See* November 6, 2013 Electronic Order.

On April 14, 2014, Judge Wall recommended that Defendants' motion be denied. *See* DE [106]. On September 10, 2014, Judge Feuerstein terminated Defendants' motion and Judge Wall's report and recommendation in light of the Court's conversion of the motion for judgment on the pleadings to a motion for summary judgment. *See* September 10, 2014 Electronic Order. Defendants filed their motion for summary judgment on September 25, 2014, *see* DE [131], which Judge Feuerstein referred to this Court. *See* September 29, 2014 Electronic Order.

This Court recommended Defendants' motion be granted and the case dismissed on May 22, 2015. *See* DE [158]. Judge Feuerstein adopted this Court's

report and recommendation on September 30, 2015, *see* DE [165], and Plaintiffs appealed that decision on October 27, 2015.  *See* DE [168].  On October 25, 2016, the Second Circuit vacated Judge Feuerstein's decision, and remanded the matter for further proceedings, holding that issues of material fact existed as to whether Plaintiffs were employees or independent contractors of TXX, such that summary judgment was inappropriate.  *See* DE [170].

The parties consented to the jurisdiction of a United States Magistrate Judge on January 24, 2017.  *See* DE [174].  Thereafter, the parties conducted further discovery.  Defendants filed the instant motion on August 3, 2020, *see* DE [264], which Plaintiffs oppose.

## II.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the "difficult" burden of establishing that there are no genuine issues of material fact such that summary judgment is appropriate.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted).  In deciding a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks and citation omitted); *see also Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986) (internal quotation marks and citations omitted) (emphasis in original); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party.") (citation omitted).  In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (citations omitted); *see also Jeffreys*, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (internal quotation marks and citation omitted).

## III.    DISCUSSION

### A.    <u>Plaintiffs' Status Under the FLSA</u>

Under the FLSA, employers of an enterprise engaged in commerce are required to pay covered, non-exempt employees minimum wage and overtime pay.  29 U.S.C.

§ 201 *et seq.* These provisions do not apply, however, to workers who are independent contractors, *i.e.* those who are not employees, of the employer. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988). As the Second Circuit noted in remanding this matter, the inquiry into employee status under the FLSA concerns whether, based on the totality of circumstances and "as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Thomas v. TXX Servs., Inc.*, 663 F. App'x 86, 88 (2d Cir. 2016); *see also Brock*, 840 F.2d at 1058-59; *Leevson v. Aqualife USA, Inc.*, 183 F. Supp. 3d 397, 404–05 (E.D.N.Y. 2016). The fact-intensive "economic reality test" examines five factors: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Brock*, 840 F.2d at 1058–59. The "existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts – whether workers are employees or independent contractors – is a question of law." *Id.* at 1059.

Together, these factors do not "comprise a rigid rule for the identification of an FLSA employer," but rather "provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."

*Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013), *cert. denied*, 572 U.S. 1002, 134 S.Ct. 1516 (2014) (citations and internal quotation marks omitted).

Here, Defendants argue the Plaintiffs were independent contractors of TXX and therefore not subject to the FLSA, while Plaintiffs maintain that while certain contracts identified them as independent contractors they were, in substance, employees of the Company. As there are genuine disputes of material fact at issue, the Court denies Defendants' motion for summary judgment as to Plaintiffs' first cause of action under the FLSA.

i. *TXX's Degree of Control Over Plaintiffs*

The Second Circuit recognizes a number of non-exhaustive factors to consider when deciding whether a company exerts sufficient control to confer employment status, including whether the putative employer requires individuals to work exclusively for the company's business, prohibits working for or interacting with competitors during the working relationship, works against the interests of a competitor, imposes inflexible shifts, demands workers achieve large quotas or work long hours such that it is impractical to work elsewhere, or otherwise implements restrictions on or sanctions for external economic conduct among others. *See Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 141-42 (2d Cir. 2017) (collecting cases finding that a business "relinquishes control" over a worker and thereby makes the worker "less economically dependent" when it allows the worker "to work for its competitors" or "draw income through work for others").

In *Saleem*, the Court initially analyzed control by assessing the level of affiliation drivers had with their putative employer.   The Court noted that the "driver-owners" chose to enter franchise agreements instead of seeking more conventional employment.   *Id.* at 140.   Further, each of the plaintiffs' agreements designated them independent contractors.   *See id.*   Based on the combination of the contract language and the Court's assessment of actual and practical control, it found the driver-owners to be independent contractors.   *See id.* at 141 (explaining that while an employer's "self-serving label of workers as independent contractors is not controlling," it bears on the nature of the relationship).

Here, similar to the situation in *Saleem*, the plain language of the parties' written agreements provides for independent contractor status, as it requires specific results, but does not provide that TXX will control the manner or means for Plaintiffs to accomplish those results.   Facially, therefore, the contracts favor independent contractor status.   Moreover, Plaintiffs were not on the Company's payroll, did not receive benefits from TXX and filed tax returns characterizing themselves as independent contractors.   *See* Defendants' Memorandum in Support of Motion for Summary Judgment ("Def. Mem."), DE [264-3], 15-16.   And while Defendants maintain that Plaintiffs did, in fact, provide transportation services at their own convenience, including with respect to the scope of services and cost objectives, and engage assistance from others and schedule and perform transportation services to others apart from those for TXX, s*ee* Def. Mem., 15-16, there is evidence to the contrary.

Plaintiffs submit evidence that the agreements deeming them independent contractors reflect merely the form and not substance of the TSPs' relationships with TXX.  According to Plaintiffs, TXX controlled the composition of routes, which were comprised of stops, which in turn impacted TSPs' pay, requiring Plaintiffs to take all stops on their routes and threatening punishment if they rejected a single stop.  *See* October 25, 2019 Declaration of Richard Armstrong ("Armstrong Dec."), DE [265-83], ¶¶ 24-25; November 3, 2019 Declaration of Degou George Paul ("Paul Dec."), DE [265-55], ¶ 17; December 10, 2019 Declaration of Lester Alexander ("Alexander Dec."), DE [265-85], ¶ 6; September 4, 2019 Declaration of Jeffrey W. Pagano in Support of Defendants' Motion for Summary Judgment ("Pagano Dec."), DE [264-4], Exhibit ("Ex.") 352, January 16, 2019 Deposition Transcript of John Hunt ("J. Hunt 2019 Tr.") at 116-17.  Moreover, Plaintiffs note that TXX controlled customer relationships, and assert that TSPs could not have made deliveries for certain customers other than through TXX due to its secure facilities and the fact that the Company's customers often prefer to deal with TXX rather than one of the hundreds of drivers.  *See* February 10, 2020 Declaration of Denise A. Schulman ("Schulman Dec."), DE [265-2], Exs. 13, TCC1; 16, TCC173; 17, TCC 180.

Plaintiffs also point to instances in which the Company supervised and disciplined them, although their work was "low skilled and routine," by instructing them as to loading vehicles, completing paperwork, using scanners and getting to delivery locations.  *See* October 24, 2019 Declaration of Rosa Marin ("Marin Dec."), DE [265-52], ¶¶ 5-6; December 9, 2019 Declaration of James Grant ("Grant Dec."),

DE [265-51], ¶¶ 9, 50; December 15, 2019 Declaration of Cushi Cunningham ("Cunningham Dec."), DE [265-78], ¶¶ 11-13, 39, 46; December 24, 2019 Declaration of Joseph Morris ("Morris Dec."), DE [265-61], ¶ 36.  On occasion, TXX supervisors accompanied them on new routes and followed drivers to check on job performance. *See* Marin Dec. ¶ 7; November 1, 2019 Declaration of Carl Henry ("Henry Dec."), DE [265-64], ¶ 10; November 29, 2019 Declaration of John Dean ("Dean Dec."), DE [265-50], ¶ 24; Grant Dec. ¶¶ 40, 41; Cunningham Dec. ¶¶ 23, 33; Morris Dec. ¶ 37; Schulman Dec. Ex. 5, TC4494.  The Company has also threatened and punished drivers for trying to or actually rejecting work assignments, asking for higher pay, making delivery errors, questioning dispatchers and not following schedules precisely.  *See* Henry Dec. ¶¶ 18-19, 32; Alexander Dec. ¶¶ 6-7, 10; Dean Dec. ¶¶ 15, 28-29; Grant Dec. ¶ 20, 24-27, 33, 36, 55-56; Cunningham Dec. ¶¶ 26-27; Marin Dec. ¶¶ 7-8, 13-16; Paul Dec. ¶ 12; February 5, 2020 Declaration of Nicholas Baratta ("Baratta Dec."), DE [265-81], ¶¶ 21-22.  Moreover, TXX supervisors and dispatchers contacted Plaintiffs while on the road to provide additional assignments, check on delivery times and address mistakes, and have held meetings with drivers to discuss policies and procedures.  *See* Armstrong Dec. ¶¶ 22, 32-33, 35-36; Armstrong Dec. Ex. 1; Cunningham Dec. ¶¶ 35-37, 49, 51; Henry Dec. ¶¶ 23, 38; Morris Dec. ¶¶ 28, 38-39; Morris Dec. Ex. 1; Dean Dec. ¶¶ 7, 23, 25-26; Grant Dec. ¶ 50.  Many believed they had to comply with supervisors' wishes to keep their jobs.  *See* undated Declaration of Eduardo Fernandez ("Fernandez Dec."), DE [265-75], ¶ 40.

Plaintiffs further submit evidence that TXX controlled their schedules, setting arrival times and punishing drivers who were late, as well as times by which Plaintiffs must return empty freight totes, returned merchandise and paperwork. *See* Armstrong Dec. ¶¶ 12-13, 19; Cunningham Dec. ¶¶ 7, 24, 30; Dean Dec. ¶¶ 21, 29; Fernandez Dec. ¶ 32; Grant Dec. ¶¶ 29, 32, 52; Henry Dec. ¶ 28. The Company prohibited unscheduled stops. *See* Cunningham Dec. ¶ 47; Grant Dec. ¶¶ 54-55. While Defendants argue vehicles and attire were provided solely by Plaintiffs, Plaintiffs counter that until around 2012 or 2013, TXX required them to wear uniforms identifying them as TXX agents, and the Company has, at times, directed the use of certain types of vehicles. *See* Alexander Dec. ¶¶ 11-13; Baratta Dec. ¶ 39; Baratta Dec. Ex. 1; Cunningham Dec. ¶ 58; Fernandez Dec. ¶ 47; Morris Dec. ¶¶ 50-51; Morris Dec. Ex. 4.

These are precisely the issues of fact that the Second Circuit has held necessitate denial of summary judgment. *See, e.g.*, *Agerbrink v. Model Serv. LLC*, 787 F. App'x 22, 25 (2d Cir. 2019) ("When drawing inferences in the light most favorable to [Plaintiff], . . . a reasonable jury could have concluded that she was [an] employee"); *Thomas v. TXX Servs., Inc.*, 663 F. App'x 86, 89 (2d Cir. 2016) (finding disputed issues of material fact in this case that precluded summary judgment). Accordingly, the Court finds that a number of material facts related to the issue of control are disputed, and weigh in favor of denying Defendants' motion.

18

ii.   *Plaintiffs' Opportunity for Profit or Loss and Investment in TXX*

In determining whether a worker had an opportunity for independent profit or loss and investment in the business, courts have considered whether workers:  (1) had principal control over how much money they earned as a result of the number of jobs they took; (2) made decisions affecting their overall profitability; (3) determined their own driving routes; or (4) have invested in the business.  *See Saleem*, 854 F.3d at 144-45; *Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp.3d 1, 12, (E.D.N.Y. 2014); *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 607-09 (E.D.N.Y. 2012); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp.2d 184, 191 (S.D.N.Y. 2003). In determining whether someone is an employee, versus an independent contractor, courts also consider the worker's level of investment in building personal relationships with his clients.  *See Saleem*, 854 F.3d at 143 (finding that drivers were independent contractors when they "made investments to build [client] relationships," advertised for their services independently, and served repeat personal clients).  A worker may be considered an independent contractor if he has the ability to seek work from other employers, while continuing his relationship with the defendant-employer.  *See id.*; *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 307 (E.D.N.Y. 2009).

TXX argues that Plaintiffs were able to exercise their own discretion to provide transportation services to other companies, including competitors, so long as no government regulations precluded mixing other items with TXX's freight, and indeed some of them did.  *See* Pagano Dec. Ex. 349, June 21, 2018 Deposition Transcript of

James Grant ("Grant Tr.") at 88; Pagano Dec. Ex. 343, April 18, 2018 Deposition Transcript of Derek Lewis ("Lewis Tr.") at 163-64, 130-33; Pagano Dec. Ex. 344, May 24, 2018 Deposition Transcript of Edgar Campos at 212-13; Pagano Dec. Ex. 145, Deposition Ex. CH 15.  Further, according to Defendants, Plaintiffs invested in a "significant manner" in their transportation service businesses, for which TXX did not provide vehicles or equipment, nor was it responsible for maintenance or expenses.  *See* Pagano Dec. Ex. 321 ¶¶ 11, 24; Pagano Dec. Ex. 355, February 6, 2019 Deposition Transcript of Lester Alexander at 42; Pagano Dec. Ex. 339, February 7, 2019 Deposition Transcript of Carl Henry at 53-55; Pagano Dec. Ex. 322 ¶ 33. Plaintiffs, Defendants argue, are solely responsible for their revenue generated, as the Company does not guarantee revenue or require a minimum or maximum level of transportation services and it is therefore within the Plaintiffs' discretion to invest in larger vehicles and hire additional employees to increase their efficiency and capacity.  *See* Pagano Dec. Ex. 322 ¶ 30; Pagano Dec. Ex. 325 ¶ 24.

Plaintiffs disagree, pointing out that TXX controls job assignments and pay rates, thereby evidencing Plaintiffs' lack of opportunity profit or loss because such opportunity depends upon the Company's provision of work assignments and the Plaintiffs' efficiency rather than managerial skills.  *See* Fernandez Dec. ¶¶ 15-18; Grant Dec. ¶¶ 21-22; Armstrong Dec. ¶¶ 33, 54; Cunningham Dec. ¶¶ 49-50; Dean Dec. ¶ 23; Alexander Dec. ¶¶ 6-7; Baratta Dec. ¶ 22.  Unlike Defendants' characterization that Plaintiffs had principal control over how much money they earned as a result of the jobs they took and made decisions affecting their profitability

20

because they could choose whether to obtain work from TXX, Plaintiffs contend that the *Company* controlled the work assignments and required them to take or keep unwanted assignments, at times to Plaintiffs' financial detriment. *See* Alexander Dec. ¶¶ 6-7; Fernandez Dec. ¶ 15; Morris Dec. ¶¶ 22-23; January 9, 2020 Declaration of Adriana Ortellado ("Ortellado Dec."), DE [265-57], ¶¶ 41-53. Plaintiffs submit further evidence of TXX's control over TSPs' profitability through the Company's veto of Plaintiffs' use of helpers, as well as its directions as to the types of vehicles Plaintiffs could use. *See* Ortellado Dec. ¶¶ 16-31; Baratta Dec. ¶¶ 25-26; Cunningham Dec. ¶¶ 18, 21; Dean Dec. ¶ 4; Henry Dec. ¶¶ 39-40.

The Court concludes that the above evidence establishes issues of material fact such that this factor weighs in favor of denying Defendants' motion. In reaching this conclusion, the Court acknowledges that Plaintiffs were responsible for their own work expenses, which primarily comprised their vehicles and related expenses. *See* Pagano Dec. Ex. 363, February 19, 2019 Deposition Transcript of Tejdhari Raghubir at 31-32; Pagano Dec. Ex. 338, April 25, 2018 Deposition Transcript of Branne Gonzalez at 101-02; Pagano Dec. Ex. 364, February 20, 2019 Deposition Transcript of Winston Lindsay at 58. The Court nevertheless finds that this fact is insufficient to grant Defendants' motion.

iii. *Degree of Skill and Independent Initiative Required to Perform the Work*

Independent contractor status is indicated by a high degree of skill and independent initiative exhibited by the worker. *See Brock*, 840 F.2d at 1060; *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp.2d 901, 920 (S.D.N.Y. 2013). Skill, however, is

not in itself indicative of independent contractor status. *See Brock*, 840 F. 2d at 1060 ("A variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees under the FLSA").  Although some courts do not consider drivers in every industry to be highly skilled, courts have found trucking positions, particularly those that involve the transportation of cargo, to demonstrate a high level of skill.  *Compare Gustafson v. Bell Atl. Corp.*, 171 F. Supp.2d 311, 326 (S.D.N.Y. 2011) ("there is no genuine dispute that plaintiff's duties as a chauffeur required no specialized skill or initiative") *with Browning*, 885 F. Supp.2d at 608-09 (stating that plaintiff truckers "needed to have professional driving skills, . . . knowledge of Department of Transportation regulations, and freight-handling skills" indicating employee status) *and Arena*, 3 F. Supp.3d at 12 (determining that a taxi driver's responsibility of navigating his routes, maintaining the safety of passengers, and initiative in accepting dispatched calls constituted a skill set that favored against employee status).

Here, Defendants argue that Plaintiffs must have professional driving skills, business management skills, knowledge of Department of Transportation regulations, freight handling skills and familiarity with DEA and other government requirements regarding the transportation of controlled substances, to indicate independent contractor status.  *See* Def. Mem., 20.  Further, Defendants maintain that Plaintiffs were responsible for determining the most appropriate method to ensure receipt, as well as their routes, which demonstrates the necessary initiative on the part of Plaintiffs to support their motion.  *See* Pagano Dec. Ex. 321 ¶¶ 16, 27;

Pagano Dec. Ex. 334, May 17, 2018 Deposition Transcript of Adriana Ortellado at 164-65; Pagano Dec. Ex. 322 ¶ 12; Pagano Dec. Ex. 232 ¶ 10; Pagano Dec. Ex. 350, March 13, 2019 Deposition Transcript of John Dean at 107, 179-82; Pagano Dec. Ex. 343, Lewis Tr. at 161; Pagano Dec. Ex. 349, Grant Tr. at 89.

Plaintiffs disagree, arguing, as this Court held previously, that their work did not involve any specialized skill. *See* DE [158], 32-33. Plaintiffs' job did not require a commercial driver's license, and many Plaintiffs did not have prior delivery experience. *See* Alexander Dec. ¶ 3; Armstrong Dec. ¶ 3; Cunningham Dec. ¶ 4; Fernandez Dec. ¶¶ 3-4; Henry Dec. ¶ 3. Plaintiffs further assert that Defendants' arguments as to Plaintiffs' "initiative" are belied by the fact that, in practice, bidding did not produce many meaningful jobs for Plaintiffs and a number of Plaintiffs did not place any bids whatsoever. *See* Armstrong Dec. ¶¶ 46-49; Baratta Dec. ¶¶ 9, 41; Cunningham Dec. ¶¶ 62-63; Fernandez Dec. ¶¶ 48-49; Henry Dec. ¶¶ 46-47; Morris Dec. ¶¶ 52-55; Ortellado Dec. ¶ 44.

Accordingly, whether Plaintiffs were required to have a degree of skill and initiative, to establish that they were independent contractors, cannot be determined on summary judgment, as there are questions of material fact precluding resolution.

iv. *Permanence or Duration of the Working Relationship*

In evaluating the permanence of the working relationship between parties, courts have analyzed both: (1) the duration of the working relationship between parties; and (2) whether the workers were free to perform work for others while working for the company in question. *See Brock*, 840 F.2d. at 1060-61; *Velu*, 666 F.

Supp.2d at 307 ("plaintiff may work for other companies while continuing his relationship with [current company]"); *Lee v. ABC Carpet & Home*, 186 F. Supp.2d 447, 456 (S.D.N.Y. 2002). Where the record indicates that a worker performed the job on "essentially a full-time basis," this factor favors a finding that the worker is an employee as opposed to an independent contractor. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp.3d 339, 351-52 (E.D.N.Y. 2015). Contractual agreements that describe workers as independent contractors are not necessarily controlling on this issue, as such designation is "pertinent to the parties' beliefs about the nature of the relationship." *Saleem*, 854 F.3d at 141.

Defendants argue that the agreements covering the Plaintiffs' relationships with the Company were for set terms, with the possibility for renewal, and that some agreements were terminable at will, and therefore that the relationship between TXX and Plaintiffs was not permanent. *See* Pagano Dec. Ex. 256, Deposition Ex. DP 3; Pagano Dec. Ex. 257, Deposition Ex. DP 4; Pagano Dec. Ex. 258, Deposition Ex. DP 6; Pagano Dec. 259, Deposition Ex. DP 7. As Plaintiffs argue, however, that the agreements referred to them as independent contractors has little meaning, as most TSPs remained with the Company for an indefinite period, with many keeping the same routes for years. *See* Armstrong Dec. ¶¶ 8, 17, 23; Fernandez Dec. ¶¶ 12-14; Grant Dec. ¶ 19; Henry Dec. ¶ 16. As such, it is impossible to determine on summary judgment the permanence of the working relationship between the TSPs and TXX, weighing in favor of denying Defendants' motion.

v.    *Extent to Which the Work Was an Integral Part of TXX's Business*

The final factor is whether the work at issue is integral to TXX's business.  *See*

*Brock*, 840 F.2d at 1059 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730,

67 S.Ct. 1473, 1476, (1947)); *Franze v. Bimbo Foods Bakeries Distribution, LLC*, No.

17-CV-3556(NSR), 2019 WL 2866168, at *9-*10 (S.D.N.Y. July 2, 2019), *aff'd sub*

*nom. Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74 (2d Cir. 2020).  Even where

the work performed by Plaintiffs is integral to Defendants' business however, the

weight of this factor is diminished where the work performed easily is

interchangeable with work by other drivers.  *See Browning*, 885 F. Supp.2d at 610

("Therefore, while the [p]laintiffs' work was integral to [the company], this factor only

weighs slightly in favor of finding that the [p]laintiffs should qualify as employees

under the FLSA, and would not prevent this Court from finding, as a matter of law,

that the [p]laintiffs are independent contractors."); *Arena v. Plandome Taxi, Inc.*, No.

12 CV 1078 DRH WDW, 2014 WL 1427907, at *6 (E.D.N.Y. Feb. 26, 2014) ("This

factor provides little assistance in determining the employment relationship" because

although the driver's operation was essential to the business, it was equally as

important that the driver was not indispensable); *Velu*, 666 F. Supp.2d at 307 (noting

that although the plaintiff's work was an integral part of defendant's business model,

the work performed by the driver was interchangeable with the work of other

drivers).

Defendants argue that Plaintiffs' work was not integral to TXX's business, but

that even if it was, Plaintiffs were all replaceable.  Plaintiffs argue in opposition that

the Company contracts with customers for delivery services, and that its profit is the difference between what its customers pay TXX and what the Company pays the TSPs. *See* Pl. Opp., 25-27. The Court agrees that without drivers, TXX's business would be severely impacted, and Defendants cannot attempt to evade that fact by continuously referring to the Company as merely a broker. Further, replaceability increases as the level of skill required decreases, and therefore it is illogical to use replaceability to determine whether Plaintiffs' work is integral because those two factors would neutralize each other in this analysis more often than not. As such, this factor appears to weigh in favor of employment status, though the issue is best reserved for trial.

Accordingly, weighing all of the factors, issues of material fact exist as to Plaintiffs' employment status under the FLSA, and therefore, Defendants' motion for summary judgment as to Plaintiffs' FLSA claim is denied.

### B. <u>Plaintiffs' Status Under the NYLL</u>

New York courts use similar factors to assess employee status under the NYLL as federal courts use under the FLSA. The NYLL, however, has a "slightly different emphasis." *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 536 (S.D.N.Y. 2014), *order clarified*, No. 12-CV-8450 JMF, 2014 WL 7106442 (S.D.N.Y. Dec. 9, 2014), *and aff'd sub nom. Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131 (2d Cir. 2017). In *Bynog v. Cipriani Group, Inc.*, the New York Court of Appeals listed relevant factors as: "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the

employer's payroll and (5) was on a fixed schedule." *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S. 2d 692, 695 (2003). "[T]he critical inquiry" under the NYLL "pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Id.*

In conducting this analysis, many courts in this circuit have analyzed the FLSA and NYLL factors together, *see, e.g.*, *Saleem*, 52 F.Supp. 3d at 536; *Sellers v. Royal Bank of Canada*, No. 12 CIV. 1577 KBF, 2014 WL 104682, at *6 (S.D.N.Y. Jan. 8, 2014), *aff'd*, 592 F. App'x 45 (2d Cir. 2015); *Hart*, 967 F.Supp.2d at 924 ("[T]here appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not he NYLL (or vice versa)"); *Browning*, 885 F.Supp.2d at 599; *Velu*, 666 F.Supp.2d at 306-07. The Court therefore need not conduct a separate analysis under the NYLL.

Applying these standards and the analysis above, the Court concludes that there are questions of material fact as to the degree of control exercised by TXX over Plaintiffs, as well as whether Plaintiffs were free to work on their own terms or on a fixed schedule, such that summary judgment as to Plaintiffs' NYLL claims, all of which turn on Plaintiffs' employment status, is also inappropriate. Accordingly, summary judgment as to Plaintiffs' employment status under the NYLL is denied.

**C.** **Hunt's Status as CEO of TXX**

Finally, the parties disagree as to whether Hunt, in her individual capacity, is liable for FLSA and NYLL violations. Individual defendants are liable under both statutes if they are "employers." *See Irizarry*, 722 F.3d at 105. Courts consider four

factors in determining whether an individual is an employer, namely whether the individual: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry*, 722 F.3d at 104-05.

Defendants maintain that while Hunt is the CEO, she does not exercise either direct or indirect control over TXX operations or Plaintiffs. *See* Pagano Dec. Ex. 366, January 17, 2019 Deposition Transcript of Patricia Hunt ("P. Hunt 2019 Tr.") at 24-25; Pagano Dec. Ex. 365, August 22, 2014 Deposition Transcript of Patricia Hunt ("P. Hunt 2014 Tr.") at 35, 38, 46, 52, 55-56, 58-59.   Rather, her role is limited to evaluating basic expenses and she does not participate in any activities relating to the transportation services Plaintiffs provide. *See* Pagano Dec. Ex. 365, P. Hunt 2014 Tr. at 15, 29, 46, 55-56, 58-59; Pagano Dec. Ex. 366, P. Hunt 2019 Tr. at 15, 28-30, 56.   Plaintiffs, on the other hand, point to several decisions by Hunt, including the issues at the heart of this case, namely, to switch Plaintiffs' classification from employees to independent contractors, thereby evidencing her operational control. *See* Pagano Dec. Ex. 365, P. Hunt 2014 Tr. at 20:8-14, 21-23, 38-39.   Moreover, Hunt took a leading role in appealing an award of unemployment insurance benefits awarded to one of the Plaintiffs and signed contracts and communicated with TXX customers, had the authority to sign checks on the Company's behalf, and had control over Plaintiffs' pay rates, work assignments and conditions of employment. *See* Schulman Dec. Ex. 32, Dean205-06, Dean246; Pagano Dec. Ex. 352, J. Hunt 2019 Tr.

at 56; Schulman Dec. Ex. 41; Pagano Dec. Ex. 351, August 22, 2014 Deposition Transcript of John Hunt at 130-31, 133-34; Armstrong Dec. ¶¶ 27-28.  In this regard, TXX distributed memos from Hunt regarding administrative fee increases, as well as memos regarding Department of Motor Vehicles checks on drivers, which Plaintiffs argue is evidence of Hunt's active role in supervising the conditions of their employment.  *See* Pl. Opp., 35.

Based on the above, the Court concludes that there are issues of material fact as to Hunt's role at TXX.  Accordingly, summary judgment as to her liability pursuant to the FLSA and NYLL is inappropriate, and Defendants' motion for summary judgment as to claims against Hunt is denied.

## IV.  CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion for summary judgment.

Dated: Central Islip, New York
          March  15, 2021                                    **SO ORDERED**

                                                                      s/ Steven I. Locke
                                                             STEVEN I. LOCKE
                                                             United States Magistrate Judge

29