FILED
CLERK

12/9/2021 12:45 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------
CECIL THOMAS et al,

                            Plaintiffs,

                  v.

TXX SERVICES, INC. et al,

                            Defendants.
------------------------------------

Case #2:13-cv-02789-SIL
United States Courthouse
Central Islip, New York
November 22, 2021
11:30 a.m. calendar

TRANSCRIPT FOR CIVIL CAUSE
- STATUS CONFERENCE -
BEFORE THE HONORABLE STEVEN I. LOCKE
UNITED STATES MAGISTRATE-JUDGE

- A P P E A R A N C E S -

For Plaintiffs:            DANIEL MAIMON KIRSCHENBAUM, ESQ.
                           Joseph & Kirschenbaum LLP
                           32 Broadway, Suite 601
                           New York, New York 10004
                           (212) 688-5640; (212) 688-2548 fax
                           maimon@jhllp.com

For Plaintiffs:            DENISE ANDREA SCHULMAN, ESQ.
                           Joseph & Kirschenbaum LLP
                           32 Broadway, Suite 601
                           New York, New York 10004
                           (212) 688-5640; (212) 688-2548 fax
                           denise@jhllp.com

For Defendants:            JEFFREY W. PAGANO, ESQ.
                           Twomey Latham Shea Kelley Dubin
                            & Quartararo LLP
                           33 West Second Street, P.O. Box 9398
                           Riverhead, New York 11901
                           (631) 727-2180; (631) 574-1258 fax
                           jpagano@suffolklaw.com

For Defendants:            IRA M. SAXE, ESQ.
                           Crowell & Moring LLP
                           590 Madison Avenue 20th Floor
                           New York, New York 10022
                           (212) 223-4000; (212) 223-4134 fax
                           isaxe@crowell.com

         (Proceedings recorded by electronic sound recording)

1          THE COURT:  Good morning, everybody, this is

2    Magistrate Judge Locke.  Kristin, let's call the case.

3          LAW CLERK:  Sure, judge.  Calling case 13-cv-2789,

4    Thomas et al v. Txx Services Inc. et all.  Counsels, please

5    state your appearances for the record.

6          MR. KIRSCHENBAUM:  Maimon Kirschenbaum, for

7    plaintiffs.  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MS. SCHULMAN:  Denise Schulman, for plaintiffs.

10          MR. PAGANO:  JEFFREY PAGANO, on behalf of the

11    defendants.

12          MR. SAXE:  Good morning, Your Honor, Ira Saxe, also

13    for defendants.

14          THE COURT:  Good morning.

15          THE COURT:  We're here, let's see, I guess to discuss

16    a view things.  I got the project letters from I guess last

17    week, docket entries 274 and 275, about a potential motion for

18    sanctions, which we can talk about.  Why don't we do that?  I've

19    read the letters, Mr. Kirschenbaum.  What do you want to tell

20    me?

21          MR. KIRSCHENBAUM:  A couple of things, just in quick

22    summation and in response to yesterday's letter.  First of all,

23    with respect to the sanctity with this information, there's a

24    lot more we could have told Your Honor if we were sharing what

25    was under the mediation confidentiality agreement.  The only

Thomas et al v. Txx Services, Inc., et al - 11/22/21                3

1    thing we used for this letter was what Mr. Pagano himself said

2    in open court and what he told us prior to any mediation

3    agreement, which is that they pulled the Datatrack documents.  I

4    just want to be clear about all the points.

5            In our document requests, we asked very clearly for

6    any data tracking plaintiffs' hours.  Now, the defendants in

7    their letter here say that this is not data that tracks

8    plaintiffs' hours, but we were very, very clear in our

9    deficiency letter of October 4th of 2017 that it was our

10   understanding that plaintiffs owed timely scanned items upon

11   delivery.  And if there were records of those scans, we wanted

12   those to be turned over.

13           Defendants, even in their letter yesterday, agree that

14   in response to that letter, they told us they do not maintain

15   that information.  And so, when they asked about why we didn't

16   follow up on it, it's because they told us it wasn't under their

17   control, which is why we let it go only to learn that when

18   defendants felt that they could use this information, which is

19   obviously crucial to this case, they were able to pull it.

20           Defendants talk about an expense; I don't even know

21   what expense they're talking about.  Defendants did go through

22   an expensive process, it appears, in the course of mediation of

23   creating some sort of a report based on that data, but that's

24   totally not the issue here.  This is about simply the scan data

25   for discovery plaintiffs.  It was under defendants' control.  We

Thomas et al v. Txx Services, Inc., et al - 11/22/21          4

1  asked defendants for it; they told us it was not under their

2  control, meanwhile, it was under their control because they were

3  able to pull it from Datatrack.

4       Defendants talk about there having been some sort of

5  damages-only discovery; that's just not true.  Nowhere in this

6  case was it ever discussed that there was damages only

7  discovery.  We specifically asked for the data; they didn't

8  object on the grounds that we were only conducting liability

9  discovery.  And most significantly, they took a ton of discovery

10  relating to damages from the plaintiffs.  I cannot overstate how

11  painful it is that at the end of an eight-and-a-half-year

12  litigation, defendants turned up with data that goes to the

13  heart of this case.  They turned up with it because they thought

14  it would help them now, but they denied having it under their

15  control when we asked them for it multiple times.

16       THE COURT:  Okay.  So, then what are you asking for?

17       MR. KIRSCHENBAUM:  We'd like to brief it and ask for

18  sanctions and the negative inference.

19       THE COURT:  Okay.  Sanctions?  What sanctions?  First

20  of all, what would a negative inference look like here, And

21  then, what sanctions.  Or is that it?  Is that the only thing

22  you want?

23       MR. KIRSCHENBAUM:  The negative inference would

24  essentially be that plaintiffs' hours worked are in accordance

25  with what plaintiffs said in their interrogatories, and that

1  can't be refuted by the data that's in the newly produced

2  scanner reports.  (B) That the scanner reports --

3          THE COURT:  Well, that's not a negative inference.

4  You want to preclude their evidence.

5          MR. KIRSCHENBAUM:  I also want to preclude their

6  evidence, yes.  I want an inference that the data that they

7  held, instead of turning it over, would corroborate what

8  plaintiffs said in their interrogatories.  I want the data

9  itself to be precluded because we haven't had a full chance to

10  ask any questions about.  I should just point out, the

11  defendants -- wait, I'll get to that in a minute.  And then

12  third, just a plain sanction for causing us to waste our time.

13  Sanctions against defendants and their counsel for causing us to

14  chase our tails when they actually should have produced it.

15          The one thing I just want to add to the equation,

16  which I should have mentioned earlier, is that defendants

17  currently have this data and they probably had it for months,

18  for all we know, and they still haven't turned it over.  And

19  they magnanimously put in their letter yesterday that they would

20  consider giving it to us.  How in the world is it not currently

21  information that they should have produced?

22          THE COURT:  Okay.  Mr. Pagano?

23          MR. PAGANO:  First let's, Your Honor, take a look at

24  what was requested in the request for production.  It was "hours

25  worked."  The scan data does not demonstrate directly or

1    indirectly hours worked.  Why?  Because the scan data scans when

2    a transaction takes place in relation to a driver corporation.

3    The driver corporation can deploy numerous individuals to engage

4    and perform the service.  It has nothing whatsoever to do with

5    hours worked.

6                 THE COURT:  Now, how is it relevant to --

7                 MR. PAGANO:  And secondly --

8                 THE COURT:  Wait.  Wait.

9                 MR. PAGANO:  Excuse me?

10                THE COURT:  And how is it relevant to the mediation?

11                MR. PAGANO:  That's the point.  Just let me continue,

12   Your Honor.

13                THE COURT:  Go ahead.

14                MR. PAGANO:  That data is then put in moment by moment

15   into a database so that you can have a delivery occurring in

16   Montauk at the same time occurring in Pennsylvania, and it would

17   go into, what I call "a bucket" moment by moment.  So, the data

18   is not related to even a route, it's related to a time.  So,

19   that data was discussed in detail during the discovery process,

20   and there are more communications, Your Honor, between counsel.

21   And to the extent there are even emails from November 14th that

22   say, "At this point, it looks like the only outstanding

23   discovery issues are the ones we discussed -- production of tax

24   returns, bank statements, and defendants' production of customer

25   contracts and agreements."

1      This pot of data was discussed.  And that time, it was

2  in the possession, custody, and control, and opposing counsel

3  was informed of a company called Datatrack.  The company,

4  meaning Txx, does not have control over that data.  So, what

5  happens --

6      THE COURT:  So, how can --

7      MR. PAGANO:  Hold on, Your Honor.  What happens is,

8  that data can be used for a DEA type investigation.  In other

9  words, was the delivery made.  Then Datatrack would go into the

10 data and pull up the scan.  Your Honor, I've been on this case,

11 as you know, for seven, eight years, and I've been passionate

12 about the independent contractor status.  So, what happened was,

13 in the mediation, I decided and Ira as well, we stepped back.

14 We called in another law firm and experts to see if this case

15 could be settled.  So, what happened was, that law firm deployed

16 experts to dive into the pot and try to assemble the data in a

17 way that could demonstrate, only as to a segment of people,

18 solos.

19      Remember, we have eight groups here.  We have

20 corporations that have multiple trucks and multiple people; we

21 have corporations that have three or four people, two trucks;

22 and we have solo corporation.  So, the point that I made earlier

23 is that, you can't tell from the swiping who swiped, and

24 therefore, you can't tell whether or not a discovery plaintiff

25 was the person who swiped it.  So, what they did was, the

1  experts pulled it together and just went through the data.  I

2  don't have the algorithms, I don't have a clue, Your Honor.  But

3  they went through and tried to assemble data as to one group for

4  solos, the corporations with one person.  So that at least you

5  had some assurance that the one person, if they were a discovery

6  plaintiff, the time spent scanning could be determined in some

7  way.

8          Now, keep in mind, time between scanning is their own

9  time.  And there's evidence that they go to lunch, they meet up

10  with their girlfriends, they do all sorts of things.  But

11  nonetheless, the experts put together this data and gave it to

12  the other side, unfiltered, what our experts did.  And it was

13  total and complete disclosure.  Until these experts were called

14  in because Ira and I stepped back, that data, while discussed

15  with opposing counsel, and she was given the opportunity to

16  request it.  And in fact, I have direct recollections of

17  Datatrack.  I had no intention of even playing with Datatrack

18  until the mediation process came up in order to get a

19  settlement.  I wanted the case to go away for the interest of

20  the client.

21          Now, they can have the data.  Quite frankly, as a

22      practical matter from my standpoint, the cost and expense

23      was ours.  They didn't want to incur the cost and expense

24      to jump into the bucket to do what we did.  That's why they

25      walked from it in 2017.  Even though, throughout the

1    depositions, over 400 times discovery plaintiffs testified

2    as to scans.  So, Your Honor, when you think about

3    sanctions, it's one thing to suggest that we did documents,

4    it's another thing to suggest that we had actual control

5    over.  Because it goes to a third party.  What we did was,

6    reach out and get it during the process.  But more

7    importantly, they chose neither to ask us for it, beyond

8    that one letter, even though there were multiple meetings

9    afterwards through 11/17, nor did they go to Datatrack.

10         THE COURT:  Here's the thing --

11         MR. PAGANO:  So, I sit back --

12         THE COURT:  Mr. Pagano?

13         MR. PAGANO:  I sit back, Your Honor, --

14         THE COURT:  Mr. Pagano?  Mr. Pagano?

15         MR. PAGANO:  I'm sorry.

16         THE COURT:  Mr. Pagano, you still have answered my

17    question.  First, it's clearly relevant to some degree for

18    the mediation because you've used it for that.  Now, you've

19    explained that it was only helpful with respect to either

20    one class or a subset of the plaintiffs.  I get that.  But

21    you can't say it's not relevant at the same time that you

22    use it for your benefit.  The other thing is you say that

23    you don't have control, yet you were able to get the

24    information.  How did you get the information?  Did you

25    just call Datatrack and ask for it?  How did that come into

1    your, this co-counsel's, or expert's possession?

2         MR. PAGANO:  Your Honor, I believe representatives of

3    the experts and perhaps the company went to it.  Your

4    Honor, as to relevance, I'm not arguing relevance.  I'm not

5    arguing that we couldn't get it.  I am saying, Your Honor,

6    they had the opportunity to get it, and they said no, once

7    it was described.

8         THE COURT:  But didn't --

9         MR. PAGANO:  Your Honor, I have --

10        THE COURT:  I want to first make sure I'm

11   understanding correctly.  So, your discovery responses, and

12   I'm predicting what Mr. Kirschenbaum is going to say, said

13   you didn't have it.  And then you're suing the absence of a

14   conversation from a subsequence letter to say it wasn't on

15   the table.  That is a little less clear to me than it is to

16   you in terms of the logic.

17        MR. PAGANO:  No, Your Honor, the answer was, hours

18   worked.

19        THE COURT:  Right.

20        MR. PAGANO:  We didn't have the documents, and we said

21   at that time, we didn't have the documents.  Now, in the

22   discussions, there was no further answer to the original

23   discovery response.  In the discussions we had in the meet

24   and confer, and they never moved on it, is when I described

25   it, when Ira and I both described what Datatrack was, and

1    they walked from it in meet and confer.  That's the

2    problem.

3        THE COURT:  Okay.  Mr. Kirschenbaum, you wanted to

4    respond?

5        MR. KIRSCHENBAUM:  I want to interject just with a few

6    points.  First of all, Interrogatory Number 12 reads, "All

7    documents concerning the timing of deliveries made by

8    plaintiffs to delivery location, including but not limited

9    to documents requesting the scheduled delivery times and

10   actual delivery times."  The defendants' response is

11   subject to and without the waiver of four (inaudible)

12   objections, defendants respond that "Txx will produce

13   documents responsive to this request pursuant to the terms

14   of a confidentiality order."  If there was any ambiguity,

15   we cleared it up in our very clear letter of October 4th

16   that we were looking for the information.  Just because

17   it's still defendants' argument, and with all due respect

18   to Mr. Pagano, the truth is not being told right here.

19   Because what defendants are avoiding saying is that the

20   documents were clearly under their control when they

21   represented to us that the documents were not under their

22   control.

23        There is no question of expenses.  No one told us to

24   subpoena Datatrack, and defendants didn't get that

25   information by subpoenaing Datatrack.  They asked

1    Datatrack, I'm assuming, and I would be stunned to hear

2    something different than this, we are your clients, you

3    have our data, please give it to us.  And by doing that,

4    they were able to get the data.  What we understood after

5    our meet and confer was that defendants did not have that

6    ability, which they even say.  They say in the letter that

7    they wrote to Your Honor last night that they told us they

8    don't maintain the data.  How much clearer?  Would we have

9    had to say, if you don't maintain it, can you print it?

10   Like could you push a button and print it?  Could you call

11   Datatrack and get it?  We've come to the point of saying;

12   it depends on what "is" is.  They said they didn't maintain

13   it; we thought it wasn't under their control.  We thought

14   that those documents would never surface.  They were

15   plainly --

16        THE COURT:  Mr. Kirschenbaum, when did you first learn

17   about Datatrack?

18        MR. KIRSCHENBAUM:  We learned about Datatrack; we knew

19   about Datatrack during the course of discovery.  As Mr.

20   Pagano said, they testified that there were Datatrack

21   documents.  And that's why we wrote this letter --

22        MR. PAGANO:  Your Honor --

23        MR. KIRSCHENBAUM:  I'm sorry, Mr. Pagano.

24        MR. PAGANO:  No, I'm sorry.  I'm sorry.  I'm sorry.

25        THE COURT:  Go ahead.

1        MR. KIRSCHENBAUM:  That's why we wrote this letter

2   asking for this data.  The letter says, it is our understanding

3   that discovery plaintiffs electronically scanned the items, the

4   records of those scans, which presumably include the time of the

5   scans, would provide information of the hours, and therefore we

6   ask for it.  And defendants responded that they don't maintain

7   it.  So, we thought it was unavailable.  And given that we

8   thought that it wouldn't surface or couldn't surface easily, we

9   let it go.  Now, defendants, when they needed, just pulled it.

10  So, it was unlike how they presented it, it was under their

11  plain control.

12        THE COURT:  Okay.  My next question --

13        MR. PAGANO:  Your Honor, if I --

14        THE COURT:  Okay.  One second.  One second.  My

15  question to you is when did you first learn about Datatrack?

16        MR. KIRSCHENBAUM:  I don't remember the date.  Denise,

17  do you remember when we learned about it?  Not deep into the

18  litigation.

19        THE COURT:  So, it was years ago.

20        MS. SCHULMAN:  Yeah, I'd have to go back and look into

21  the depositions to see.

22        THE COURT:  The exact date doesn't matter, but years

23  ago?

24        MS. SCHULMAN:  Yes.

25        MR. KIRSCHENBAUM:  Yes.

1          THE COURT:  Okay.  Assuming the representations were

2     as you said, why not subpoena Datatrack to get that information?

3     Because you didn't know that plaintiffs could get it, right?

4     How come you didn't go for it that way?

5          MR. KIRSCHENBAUM:  We didn't go for it that way

6     because we were happy going with our client's testimony instead

7     of with the Datatrack data.  If defendants couldn't pull it,

8     then they couldn't pull it, and we let it go.

9          MR. PAGANO:  Well, why couldn't they have just

10    subpoenaed Datatrack to come to trial at that time?

11         MR. KIRSCHENBAUM:  Well, for starters, we didn't know

12    that the data could be pulled.  It was never told to us that the

13    data could be pulled by Txx or by Datatrack.  And without

14    defendants being able to pull any time records, we would have

15    had a very strong benefit of now claimant's burden shifting in

16    our favor.  So, (A) it was never told to us that the data could

17    be pulled; and (B) we would be able to make our case without the

18    Datatrack information.  However, the reality is, contrary to

19    what defendants said, the data was actually fairly easily

20    pullable.

21         MR. PAGANO:  Your Honor?

22         THE COURT:  Mr. Pagano, you're going to get to make

23    every piece of the record you want to make.

24         MR. PAGANO:  Oh, I'm sorry.  I'm sorry.  I'm sorry,

25    Your Honor.

1    THE COURT:  Mr. Kirschenbaum, assume for the moment

2  that this is a Rule 37 motion for sanctions.  I think the

3  caselaw says the sanction has to be the least -- I'm

4  paraphrasing -- onerous as possible to put you in the position

5  you're entitled to be in.  Are there less onerous sanctions than

6  what you're requesting?  Meaning, why can't the Court direct,

7  and I suspect Mr. Pagano would do this anyway, that they

8  identify whoever it was, put that information together.  You

9  depose them; figure out what they have and what is getable, and

10  then give it to you?  Why isn't that a sufficient sanction?

11    MR. KIRSCHENBAUM:  Because the litigation is 8½ years

12  old, and we'd have to fully reopen discovery to examine

13  plaintiffs actually hours worked building off of that building

14  block of the Datatrack data.  It's a whole other world.  It's

15  basically a window into what plaintiff did in a day.  We'd have

16  to essentially litigate this case from scratch now, 8½ years in.

17  It's mindboggling.  This is exactly --

18    THE COURT:  I understand why you're saying it, and I

19  understand your frustration given the way this has unfolded.

20  I'm not sure I agree with you in terms of the outcome of this.

21  You've got your client's version of what happened; they have

22  some kind of computer printout that's relevant to at least some

23  part of their version of hours worked.  They compiled it through

24  the use of what I'll call an expert, although I'll use a small

25  'p' to describe that for now.  And you cross examine them.  And

1   if there's more information that they have that you want, either

2   you'll get it, unless they object, but I suspect you'll get it.

3   Then, you should be done.  Yes, it's an eight-and-a-half-year-

4   old litigation, but that's partially the parties' fault too,

5   right?  Did Judge Feuerstein have it down for trial at some

6   point?

7              MR. KIRSCHENBAUM:  No.

8              THE COURT:  So, apart from that, Mr. Pagano, tell me

9   everything you want to tell me.

10             MR. PAGANO:  Your Honor --

11             MR. KIRSCHENBAUM:  Wait!  Should I respond?  Does Your

12   Honor want me --

13             THE COURT:  Go ahead.  Sorry.

14             MR. KIRSCHENBAUM:  Your Honor, this could potentially

15   be hundreds and hundreds of thousands of data.  At this point we

16   don't have a way to tell Your Honor what gaping holes might be I

17   there; what they've been told are not in there; are all the

18   scans reflected?  There could be enormous holes, and I would say

19   that it would take years to conduct discovery just with respect

20   to this data at this point.

21             THE COURT:  Mr. Pagano, you've been waiting.

22             MR. PAGANO:  Yes, Your Honor, that sort of says the

23   point.  You've got to remember, also in the discovery was

24   proportionality in terms of production.  We're talking about

25   probably almost a 13-year period diving into a bucket based upon

1  22 named plaintiffs.  Like opposing counsel said, it took

2  "Experts" to go through that information.  That is what we

3  discussed in the meet and confer.  That neither side, at least

4  at the time.  And secondly --

5         THE COURT:  Let's say you're entitled to do some of

6  it --

7         MR. PAGANO:  Yes.

8         THE COURT:  -- (inaudible).

9         MR. PAGANO:  Well, Your Honor, all I'm saying is, the

10  cost and expense of going into 17 years of data with about 3,000

11  owner/operators have provided services during that period of

12  time.  That's what you jump into unless you have an expert.  And

13  we could have given them that.  And we offered to, and they

14  said, "no".  That's the point.

15         MR. KIRSCHENBAUM:  So, they decided for themselves not

16  to produce it.  And to say that we said, "no" is the lie by the

17  fact that we explicitly asked for it.

18         MR. PAGANO:  No, you weren't in the meet and confer!

19  Counsel, I am really upset at that, number one.  And number two

20  is, you weren't in the meet and confers, and you're not on the

21  emails between --

22         THE COURT:  Mr. Pagano, you're talking to me, not him.

23         MR. PAGANO:  I'm sorry.  Your Honor, there are emails

24  back and forth on the entire response to the discovery and at no

25  time was the Datatrack data requested by the other side.  Even

1   though they knew about it, after our explanation in the meet and

2   confer.  And, Your Honor, the suggestion as to Number 12, they

3   wanted the scheduled delivery stops, Your Honor, we produced

4   paper documents, TPOD's or proof of delivery.  There's a scanner

5   plus a written document that occurs when a transaction takes

6   place.  We produced those documents for the discovery

7   plaintiffs.  As well, we produced a segment called TPD in

8   response to Number 12 concerning delivery documents, which was

9   the bidding proposals by the independent contractors which sets

10  forth the dates and the times that they would make deliveries.

11  So, we gave them --

12          MR. KIRSCHENBAUM:  Your Honor, the request said

13  scheduled deliveries times and actual deliveries.  The only

14  thing that shows the actual delivery time is the scan data and

15  that is excluded from the data we asked for on October 4, 2015.

16          THE COURT:  Look.  Look.  I get the issue.  I get both

17  parts of what you're saying.  Look, the letter asked for a

18  briefing schedule.  I'm going to let you brief this.  I can't

19  say "no" to a motion.  Well, I can't say "no" to requesting to

20  make a motion, and so, I'm going to let you brief this in full.

21  The question here really seems to be factual rather than legal.

22  You both refer to things that are attached to the letters, and I

23  understand why.  That's not to say your letters are incomplete,

24  they're entirely appropriate.

25          With that being said, I also want to talk about what

1   the contours of trial in this case would look like.  Mr. Pagano

2   referred to eight classes.  And in your letter, Mr.

3   Kirschenbaum, you said you're ready to go regardless of whether

4   there's a motion for decertification, which you wouldn't oppose

5   in any event.  Is that right?

6           MR. PAGANO:  No, Your Honor.

7           MR. KIRSCHENBAUM:  I'm not sure what Mr. Pagano is

8   talking about.

9           MR. PAGANO:  Okay.  Let me just throw out what I'm

10  suggesting here.  Number one, there's no need for

11  decertification.  Counsel agrees we'll go one by one if

12  necessary.  And my point was that we choose among the hundred

13  people who fit within various groups.  For example, Your Honor,

14  there are those who are master contractors who operate

15  corporation with multiple vehicles, multiple helpers.  Then

16  there's the plaintiffs deployed, those plaintiffs who are

17  actually deployed by master contractors.  So, they're not a

18  corporation, they're the ones employed.  Then there's a group,

19  the plaintiffs who provide no services that use others to

20  operate the corporation, and others perform the services even

21  though these people have performed no services for the

22  plaintiffs.

23           The fourth one would be the plaintiffs who sold their

24  corporation and disposed of them but received income from the

25  services provided by the people who now own the corporation.

1   The next one is plaintiffs who are only helpers to a

2   corporation.  In other words, they weren't drivers, they were

3   helpers.  There are some plaintiffs in the group that are

4   helpers in that regard.  Then there's another group that we can

5   segregate called plaintiffs or driver corporations that service

6   banks.  Banks are a totally different thing.  We can segregate

7   that as opposed to pharmacies.  And then we have the solo

8   contractors.  The next one is the solo contractors, AM solo and

9   PM solos.  Solos are one person, one driver corporation.  AM,

10  they do the duties, and then there's those who are in the PM.

11  Again, driver corporations.

12          You see the platform, Your Honor, it is our position

13  that the plaintiff allows this type of business discretion.  And

14  there are some plaintiffs who sit within these various groups.

15  And it's only fair to look at the groups --

16          MR. KIRSCHENBAUM:  Can I jump in for a second?

17          MR. PAGANO:  Well, wait a minute, counsel.  Counsel,

18  please --

19          THE COURT:  Let him finish, you'll get your chance.

20  Go ahead.  Finish what you're saying, Mr. Pagano.

21          MR. PAGANO:  And then we segregate it by groups, and

22  then the jury would issue a verdict by group because you may

23  have different outcomes.  For example, a person who's claiming

24  that I work 70 hours a week, and the evidence shows that that

25  person never even stepped into a vehicle, but somebody else did

Thomas et al v. Txx Services, Inc., et al - 11/22/21          21

1   the work, that person should get nothing.  Likewise, a master

2   owner who has five different trucks, who performed no services,

3   they should get nothing.  Or a master who, for example, appears

4   to deliver when somebody in his workforce is sick.  That would

5   be the focus.  And then we can go through these groups.  Then

6   we'd have a special verdict for each group.  And then we can go

7   from there into liability, if any.

8          THE COURT:  Mr. Kirschenbaum, respond to that.

9          MR. KIRSCHENBAUM:  Just to put it bluntly, (A) there's

10  collective right now.  Are defendants moving forward with the

11  collective or not?  They may have great ideas of how they think

12  the trial should move forward, but either we're a hundred

13  individuals or we're a collective.  And question number one is,

14  are defendants moving to decertify that collective or not?

15         MR. PAGANO:  Yes.

16         MR. KIRSCHENBAUM:  It's not just like free reign for

17  them to sort of put some members together of a class.  Now, the

18  subclasses that they're talking about, there will some much

19  factual disputes, as to who goes into what class, that would be

20  many trials in and unto itself.  I can tell you, Your Honor,

21  that if somebody never drove a truck, if that is the choice

22  about a plaintiff, then we agree that that plaintiff is not owed

23  overtime.

24         So, I think if we start with the point, are defendants

25  decertifying or not?  And if they are decertifying, well then

Thomas et al v. Txx Services, Inc., et al - 11/22/21          22

1    the status is that there are 100 individuals.  And then the

2    question is, some of these individuals, should they be going to

3    trial?  It could be one; it could be two, it could be three.

4            THE COURT:  Some of them should?  I lost you.  Some of

5    them should go to trial?

6            MR. KIRSCHENBAUM:  We should talk about getting a

7    trial schedule for some of the people to get the ball rolling.

8    It could.  You know, defendants can't now, set up their own

9    class.  Do they want to move for some new kind of class

10   certification?

11           MR. PAGANO:  Your Honor, we're going to move for

12   decertification.

13           MR. KIRSCHENBAUM:  All right.  Then, we're all here

14   now in open court.  Defendants are going to move for

15   decertification; plaintiffs do not oppose decertification.  So,

16   that issue should be settled right now.

17           THE COURT:  Can we just stipulate to that?

18           MR. KIRSCHENBAUM:  Yes.  We stipulate to

19   decertification right here and now.

20           THE COURT:  I want to hear from Mr. Pagano.  I heard

21   you.  Mr. Pagano, do you agree?

22           MR. PAGANO:  Yes, Your Honor.

23           THE COURT:  Okay.  So, the class is decertified.  And

24   what will happen is, we need to put our heads together to make

25   this efficient.  And I want to float just a couple of ideas.  If

1   the class is decertified, let's say there are 100 people

2   involved.  Then we've got 100 separate trials on the horizon

3   unless we can somehow consolidate.  Is that correct?

4          MR. KIRSCHENBAUM:  What we had in a similar case in

5   the Eastern District of New York, we set a trial run for three

6   plaintiffs, and then we said we would regroup just so that there

7   would be some familiarity with what would likely come up in

8   these trials and how the issue should go forward.  And then we

9   said, at the end of those three trials, we'll put our heads

10  together and think about how to deal with the rest of the

11  plaintiffs.

12         THE COURT:  Okay.  Let me add something in, and then,

13  Mr. Pagano, I'd like your response to all of it.  Right now,

14  this is set as a jury trial.  I don't know that that's a very

15  way to go in the context of a case like this to a panel jury,

16  after jury, after jury when the topic here will be mind-numbing,

17  honestly.  I think it's going to be hard to accomplish.  So, I

18  just want you to think about that, and I'm throwing it out

19  there.  You both have a right to a jury, and I get it, but I'm

20  just giving you my experience when it comes to cases like this,

21  and how much you're really going to get from a jury.  So, Mr.

22  Pagano, respond to all of that.

23         MR. PAGANO:  Okay.  We stipulate as to the

24  decertification.

25         THE COURT:  Right.

1          MR. PAGANO:  The groups that I came up with is a way

2     of choosing people and focus.  Your Honor, we don't need a jury

3     trial from our perspective.  So, from our perspective, we're

4     fine with Your Honor deciding these cases.  The idea though is,

5     at least the way I've divided them up, one of our defenses, and

6     I think it's important, is you have a platform that is the Txx

7     platform.  And the business of delivery, and how and why, and

8     under what circumstances is up to the contractor.  That's why I

9     divided it up into eight groups that I've counted that reflect a

10    business decision by each plaintiff to operate one way or the

11    other.  So, as a practical matter, maybe there's a way of

12    agreeing on eight or ten plaintiffs at the outset among these

13    groups.  That would accomplish my goal of ensuring before Your

14    Honor that our legal position is properly maintained, meaning

15    platform 'Y', while at the same time, giving you an insight how

16    maybe one person may be is dependent upon Txx and that's who

17    they are as a human, and they ask more questions than another

18    person, who's operating four or five trucks.  And this way you

19    could have inconsistent outcomes based upon their dependency

20    that they chose to effectuate.

21          THE COURT:  I can also see that as a potential outcome

22    for this case.  I get that.  Mr. Kirschenbaum, do you want to

23    respond to that?  You don't have to because you're not going to

24    get a decision on it right now.  But I want to start

25    crystalizing how this is going to go.

1          MR. KIRSCHENBAUM:  I don't fully comprehend what

2    defendants are saying.  The biggest problem to me with what

3    defendants are saying is figuring out who goes into what

4    platform.  It's so ripe with factual issues that it's going to

5    create more than help.  I know why it's really good for

6    defendants because then they get to decertify and do everything

7    in one fell swoop.  But there's a traditional model employed in

8    court, and we briefed this in the last case when there are many

9    individuals plaintiffs.  And usually, it's my understanding,

10   that the accepted efficient model is to do a couple of test

11   trials and then see where that brings the parties viz-a-viz one

12   another pending the outcome of those trials.

13          THE COURT:  And who would pick the plaintiffs in those

14   trials?  And how many plaintiffs would be in each trial in your

15   model?

16          MR. KIRSCHENBAUM:  I mean, I would like it if we

17   picked the plaintiffs trials to be brought.

18          THE COURT:  Yes, I'm asking you, if you pick them,

19   what would the first three trials -- who would they be?

20          MR. KIRSCHENBAUM:  I'd pick three and put them in one

21   trial.  I could identify them fairly quickly.  Not on this

22   telephone call, but by the end of the week.

23          THE COURT:  No, I'm not asking you to identify anybody

24   on this telephone call.

25          MR. KIRSCHENBAUM:  Right.

1          THE COURT:  But with respect to that, given the

2     deficiencies that Mr. Pagano is hoping for, how would you

3     categorize them?  Meaning, are these single owner operators? Do

4     any of them have trucks or multiple drivers with helpers?  How

5     would you categorize them in terms --

6          MR. KIRSCHENBAUM:  We can talk about this more in

7     detail.  People who didn't drive, are very few.  Generally,

8     there's a group called solos, which is like the main category of

9     a person who had a contract and drove a truck, drove one truck.

10     There are a lot of people like that.  Like almost of the

11     discovery plaintiffs.  And that's a group that those people

12     cover because I think they represent just the most traditional

13     model.

14          THE COURT:  Okay.  So, then how would we deal with the

15     nontraditional model?

16          MR. KIRSCHENBAUM:  Well, again, with respect to the

17     nontraditional model, there's really one particular variant,

18     which is a helper.  That's a person who drove a route and did

19     not have a contract.  And so, from our view, those are the two

20     main groups.  Then there are like real outliers, who are truly

21     outliers and that's a tiny group.  We can meet and confer with

22     defendants if it's true that there is one person you know who

23     didn't drive in six years.  I don't need to go to trial on that

24     person to decide that that person is not owed any overtime

25     money.  That person is just not owed overtime money, I can tell

1   you right now.

2            THE COURT:  Okay.  And you'll think about whether we

3   need a jury for all this, yeah?

4            MR. KIRSCHENBAUM:  Yes.

5            THE COURT:  Okay.  All right.  Let's set the briefing

6   schedule that you want, and this time you'll be able to give me

7   all the exhibits that are relevant to it.  How much time do you

8   need for motion papers, Mr. Kirschenbaum?

9            MR. KIRSCHENBAUM:  Can I ask Your Honor just one thing

10  before that?

11           THE COURT:  Yes.

12           MR. KIRSCHENBAUM:  It seems to me like we'd be dealing

13  with a full deck of cards if we could take a short 30(b)(6)

14  deposition of the person that knows how the data is pulled from

15  Datatrack.

16           THE COURT:  Well, that could certainly be an outcome

17  of the motion, but okay.  Mr. Pagano, where do you stand on

18  allowing this expert, as you described it with a capital 'E' to

19  be deposed?  That's what you want, right?

20           MR. KIRSCHENBAUM:  Well, I'm talking about a 30(b)(6),

21  a person within Txx.  The expert, I think Mr. Pagano was

22  referring to, is an expert from the third party.

23           THE COURT:  So, what is it you want a 30(b)(6)

24  deposition for?

25           MR. KIRSCHENBAUM:  A 30(b)(6) to explain to us what

1   Txx did to get the information.  They can tell us what they

2   asked an expert to do or whatever, I want it to be Txx's

3   representation, not a non-Txx person.

4          THE COURT:  Okay.

5          MR. PAGANO:  Your Honor, I'm opposed to that because

6   as a practical matter, it's not relevant to the sanctions

7   motion.  In reality, here are the facts.  Your Honor, what they

8   did to get it, you've got to understand at least from our

9   perspective, we discussed this in the meet and confer and told

10  them what it would take, and they walked away.  It's not a

11  question of whether we could get it, that was just part of it.

12  The question is, what it would take to get it, meaning the

13  burdensome issue, and secondly, whether they wanted to do it

14  because we weren't going to do it.

15         THE COURT:  Okay.

16         MR. PAGANO:  It's too burdensome.  So, that's the

17  legal issue that I think has to be decided in the motion.  And

18  then if you say, okay they get the data, which by the way, we

19  gave it to them.  Now, if they want all the data, they're free

20  to have all of it.  We'll just have to figure a way how to do

21  it.  We still don't know physically how to do it to get it to

22  them.  I wasn't involved, Your Honor.  I mean directly.  I had

23  another firm and these experts come in because I wanted the case

24  settled.  So, --

25         MR. KIRSCHENBAUM:  Your Honor, behind --

1          MR. PAGANO:  Wait a second, let me finish, Maimon.

2          MR. KIRSCHENBAUM:  No, he's correct, I thought he was

3     done.

4          THE COURT:  Let him finish.

5          MR. PAGANO:  Meaning, the bottom line on a 30(b)(6)

6     is, you've got to look at the answer to the request to produce.

7     It covers it in numerous ways, burdensome and not within our

8     control.  But more importantly, Your Honor, fundamentally, we

9     discussed it.  And there are emails that don't talk about

10    Datatrack directly, but basically say, there's nothing left,

11    except for A, B, and C in an email, and that's November, I

12    believer, 17th.  So, that's why we left it.

13          And then the depositions were taking place and they

14    discussed the scanners throughout the depositions.  Nothing was

15    raised.  Jeff, would you please the scanning data?  Nothing.

16    So, that's why from our standpoint, as practical matter, what's

17    really going on here, I think it's underneath it all, is that

18    when you go through the data after it's organized by experts,

19    and I've heard opposing counsel say, look, we have experts,

20    we'll go through it.  We'll go through it, and we'll come up

21    with our conclusions.  Because they're free to do that.  I don't

22    have a problem with it.  But the bottom line is, what it shows

23    is, is that nobody worked over seven to eight hours a day.  If

24    you take that data and use it the way in which plaintiffs want

25    it to be used.  That is the problem.

1          MR. KIRSCHENBAUM:  This is the data that Mr. Pagano

2    said about 20 minutes ago, is not relevant to this case, (A).

3    And (B) is --

4          MR. PAGANO:  It's not.  It's not, counsel, because we

5    don't know who did the scanning.

6          THE COURT:  You're talking to each other.

7          MR. PAGANO:  All we know is, --

8          THE COURT:  You're talking to each other.

9          MR. PAGANO:  -- you're saying that you were on a run,

10   and all I'm saying is --

11          THE COURT:  Mr. Pagano?

12          MR. PAGANO:  Yes?

13          THE COURT:  Mr. Pagano, you're talking to each other

14   again.  Stop.

15          MR. PAGANO:  Okay.

16          THE COURT:  You're also both repeating yourself.  Let

17   me make this easy.  The application for the 30(b)(6) deposition

18   is granted.  How long will it take to produce that witness?

19          MR. PAGANO:  I don't know, Your Honor.  I'll call the

20   client and I'll get back to opposing counsel.

21          THE COURT:  Mr. Kirschenbaum, put together a proper

22   notice, so that you have the list, so that Mr. Pagano will have

23   a list of the topics.  It's all going to be related to getting

24   information, and I don't think it will be a very long list,

25   frankly.  But let's do this properly.  It can be in the letter,

1  but you should have the topics, A, B, C, D.  Okay?

2          MR. KIRSCHENBAUM:  Yes.

3          THE COURT:  How long will it take to put that

4  together?

5          MR. KIRSCHENBAUM:  We could have it by the end of the

6  week.

7          THE COURT:  Okay.  What I'm going to do is give you 60

8  days to put that together, and then that should be enough time

9  for you to get through the holidays, and produce this witness,

10  Mr. Pagano.  Unless you tell me something different.

11          MR. PAGANO:  Your Honor, the only thing is, I'm on

12  trial January and February in New Jersey.

13          THE COURT:  Two months?

14          MR. PAGANO:  I'm on trial for two months.

15          THE COURT:  Okay.  I'll conference --

16          MR. PAGANO:  I apologize.  And then Ira is out I think

17  a week or two in March.  That's our only limitations.

18          THE COURT:  Do you both have to be at this deposition,

19  or can one of you attend this?

20          MR. PAGANO:  I'm certain Ira and I can figure it out.

21  That's not a worry.  That's not a worry.  I just wanted to

22  let --

23          MR. KIRSCHENBAUM:  Your Honor, we can take this

24  deposition in December, just to be clear.  I mean, are you

25  kidding?  There's been so much delay here.

1      THE COURT:  You're saying there's been so much delay

2  like it's one person who's created it, and that's not the case.

3  I don't believe that.  So, I'm sympathetic on the one hand, on

4  the other hand, the hopes of managing this case in an efficient

5  way went out the window years ago.  So, I'm always going to

6  accommodate trial schedules, honestly.  And you can put this out

7  by the end of the week.  But if Mr. Pagano says his witness is

8  travelling for the holidays or whatever, I'm not going to get

9  underneath it, I'm telling you that now.  So, work it out or

10  don't, but I'm going to give you an end date by which this will

11  be done.  You're on trial until the end of February, Mr. Pagano?

12      MR. PAGANO:  Yes, Your Honor.  And by the way, I just

13  remembered.  To your point a moment ago, the witness I know is

14  out of the country in December and part of January.  I recall me

15  speaking to the person and them telling me, Jeff, don't do

16  anything during those months.

17      THE COURT:  Okay.

18      MR. KIRSCHENBAUM:  Your Honor, we're perfectly okay

19  with taking a remote deposition, just for the record.

20      THE COURT:  Okay.  Mr. Saxe, are you still on the

21  phone?

22      MR. PAGANO:  Ira?

23      THE COURT:  Mr. Saxe?

24      MR. SAXE:  Oh, yes, Your Honor, I apologize.  I was on

25  mute.

1          THE COURT:  Okay.  No problem.  What is your trial

2    schedule?  Are you on the same trial in January and February, or

3    do you have something else?

4          MR. SAXE:  No, no, no.  I have a family vacation out

5    of the country in March.  No, I'm not on that trial.

6          THE COURT:  So, get this done by mid-February.  You'll

7    have till February 15th, unless that's a weekend, in which case,

8    I'll tweak the date.  You have a 30(b)(6) deposition.  Mr.

9    Kirschenbaum, obviously, you can have more than till the end of

10   the week to get this notice together.  But if you want to do it

11   by the end of the week, that's fine too.

12         MR. KIRSCHENBAUM:  Okay.

13         THE COURT:  Well, I'm going to put it down.  Pick a

14   date, I'm going to put a date in the order.  You can pick the

15   date.

16         MR. KIRSCHENBAUM:  All right.  Let's make it next

17   Tuesday then, since we're already pushing this out.

18         THE COURT:  All right.  What's the date of next

19   Tuesday?

20         MR. KIRSCHENBAUM:  One second.  The date of next

21   Tuesday --

22         MS. SCHULMAN:  It's November 30th.

23         THE COURT:  November 30th.  Okay.  And I don't know if

24   you want this for the record, the reason I'm granting the motion

25   is because I get where Mr. Kirschenbaum is coming from in terms

1   of the order in which the communications were given to him about

2   what was not obtainable and then what appeared, subsequently, at

3   the mediation. So, I get it. So, I think you're entitled to

4   get underneath it. That being said, I don't know which are

5   fines when you kick those tires, but after that, we'll have a

6   conference, and we'll talk about briefing this motion.

7           I would like you to put some thoughts into the

8   contours of what the trial is going to look like. I'm all about

9   efficiency, so if both of you have wildly different opinions on

10   how it should go, I'll just have to make something up, honestly.

11   So, think about it. If you can work together, that would be

12   helpful, but if not, okay. Kristin, what do we have? The end

13   of February for a conference, Kristin.

14           LAW CLERK: Sure, judge. So, we are looking at

15   February 28th at 11:00 a.m.

16           THE COURT: Okay. And that will be a phone call.

17           MR. PAGANO: Your Honor, if I can interrupt here? My

18   trial ends on the Friday before. I guess that's the 25th. Okay.

19   I just don't know how I'll be prepared because trial ends on the

20   25th.

21           THE COURT: Look, you're either going to resolve this,

22   or I'm going to set a briefing schedule. I don't think it's

23   going to require a lot of in-depth preparation for the next

24   conference.

25           MR. PAGANO: Okay. Okay, Your Honor. Okay. That's

1  fine.  Okay.

2          THE COURT:  We can talk about trial then, but I want

3  to brainstorm about trial.  I'm not going to issue an order

4  about what the trial is going to look like at that conference

5  either.

6          MR. PAGANO:  Okay.

7          THE COURT:  So, think about it.

8          MR. PAGANO:  Okay.

9          THE COURT:  All right.  So, Mr. Kirschenbaum, I don't

10  know if I cut you off, but you definitely wanted to say

11  something.

12          MR. KIRSCHENBAUM:  If I could be so bold about that

13  February 28th date, what I'd like to do is use this time, between

14  then and now, to meet and confer with defendants about a

15  manageable trial program/schedule format, and to admit to Your

16  Honor, before that conference, if we agree, what we've agreed

17  to, and if we don't agree, what our competing suggestions are.

18          THE COURT:  Okay.  Well, here's what I'm going to

19  suggest.  Mr. Pagano, you can respond, but I'm going to direct

20  you, yes, to meet and confer.  In terms of submitting something

21  before, if you can, fine.  If not, like I said, I'm not going to

22  issue orders.  If it has to be shortly after, that's also fine.

23  I'm not married to the February 28th date, but you should meet

24  and confer regarding the contours of the trial.  That, and --

25          MR. PAGANO:  Your Honor?

1          THE COURT:  Yes, go ahead.

2          MR. PAGANO:  Oh, I'm sorry.  The only thing is, again,

3    I'm on trial January/February.  I don't know what I can get done

4    between now and January.  That's my problem.

5          THE COURT:  Okay.

6          MR. PAGANO:  That's what counsel is asking for.  Let's

7    put it this way.  If I can do it, I will.  As long as, Your

8    Honor, you understand that the trial ends on the 25th.

9          THE COURT:  Let's approach this differently.  It's

10   still only November, why don't you do it in the next two weeks?

11         MR. KIRSCHENBAUM:  We could do that.  And I feel like

12   if we submitted something to Your Honor earlier, we might

13   actually cover more ground in February.

14         THE COURT:  Meet and confer about it.  If you can

15   submit something in writing, I agree, that will be fine.  Mr.

16   Kirschenbaum, you can certainly do it.  I'd like to see

17   something, even if it says, this is what we agree on, this is

18   what we don't agree on.  This is what plaintiffs want, this is

19   what we don't agree on.  This is what defendants want.  Anything

20   like that would be helpful.   But see what you can work out in t

21   meet and confer.  I understand you're on trial, Mr. Pagano, I

22   get that, and we'll work around it, but, Mr. Saxe, there's no

23   reason why you can shuttle through the defendant's portion of

24   the letter in that regard also, so that Mr. Pagano doesn't have

25   to (inaudible) writing his section.  So, we'll do it that way.

Thomas et al v. Txx Services, Inc., et al - 11/22/21          37

1  Is there anything else?

2          MR. SAXE:  Yes, Your Honor.  Thank you, Your Honor.

3          MR. KIRSCHENBAUM:  So, when does Your Honor want that

4  submission?

5          THE COURT:  I'll take it anytime, but the week before

6  the conference is fine.  Because I'm going to have to re-read it

7  anyway.

8          MR. KIRSCHENBAUM:  Okay.

9          THE COURT:  I'm just taking notes for the moment.

10  Okay.  Is there anything else?

11          MR. KIRSCHENBAUM:  I think we're good.

12          THE COURT:  Okay.  Mr. Pagano, anything else from you?

13          MR. PAGANO:  Nothing, Your Honor.

14          THE COURT:  Ira, anything?

15          MR. SAXE:  No, thank you, Your Honor.

16          THE COURT:  All right.  Have a good holiday.

17          ALL COUNSEL:  Thank you.

18                          - o0o -

19                        CERTIFICATION

20          I, Rochelle V. Grant, approved transcriber, certify

21  that the foregoing is a correct transcript from the official

22  electronic sound recording of the proceedings in this matter.

23  _____

24  December 5, 2021

25  AA EXPRESS TRANSCRIPTS
   (888) 456-9716
   aaexpress@court-transcripts.net